905 So.2d 564 (2003)
Randal R. PALMER and Lynn I. Palmer, Individually and on Behalf of Anne Palmer, a Minor, Appellants,
v.
VOLKSWAGEN OF AMERICA, INC., Van-Trow Volkswagen, Inc., Volkswagen A.G. a/k/a Volkswagenwerk Aktiengesellschaft and Volkswagen de Mexico, S.A. de C.V. a/k/a Volkswagen of Mexico, Appellees.
No. 2001-CA-00875-COA.
Court of Appeals of Mississippi.
August 26, 2003.
Rehearing Denied February 24, 2004.
*571 Michael J. Malouf, Michael J. Malouf, Jr., Jackson, attorneys for appellants.
David L. Ayers, Robert H. Pedersen, Jimmy B. Wilkins, Jackson, attorneys for appellees.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. On April 21, 1998, ten-year-old Jennifer Palmer was a passenger in a 1995 Volkswagen Jetta driven by her sixteen-year-old sister Anne Palmer. The Jetta was involved in a collision on Highway 51 in Madison. Jennifer was struck by the Jetta's air bag and suffered fatal injuries. On behalf of Anne, the girls' parents, Randall and Lynn Palmer, sued Volkswagen of America, Van-Trow Volkswagen, Inc., Volkswagenwerk Aktiengesellschaft, and Volkswagen de Mexico (hereinafter, "Volkswagen") for the wrongful death of Jennifer Palmer, alleging various theories of products liability. The jury found for Volkswagen.
¶ 2. Aggrieved, the Palmers have appealed, and argue that the trial court committed thirteen evidentiary errors. The Palmers further argue that the trial court erroneously granted Volkswagen's motion for a directed verdict and erroneously denied *572 three of the Palmers' proffered jury instructions. The Palmers contend that the cumulative effect of the errors requires reversal. We find that several of the Palmers' arguments have merit, and reverse and remand for a new trial.

FACTS
¶ 3. On the afternoon of Tuesday, April 21, 1998, Anne Palmer left school and picked up Jennifer. Anne was driving a 1995 Volkswagen Jetta that her parents allowed her to use. At home, Anne called her mother and secured permission to drive the Jetta to a nearby convenience store to buy a Coke. Jennifer came along and rode in the front passenger seat. Neither Anne nor Jennifer was wearing a seat belt when they left the convenience store and pulled onto Highway 51.
¶ 4. The traffic on Highway 51 was heavy "stop and go" rush hour traffic. Anne was driving behind an unmarked Ford Crown Victoria driven by Madison City Police Officer Thomas Mikula. There was a minivan in front of the Crown Victoria. The minivan stopped suddenly to let someone out of the post office, and the Crown Victoria braked to avoid hitting the minivan. Anne applied her brakes, but the Jetta struck the rear end of the Crown Victoria, which then hit the minivan. The Jetta's driver side and passenger side air bags deployed. The passenger side air bag struck Jennifer.
¶ 5. Officer Mikula was unhurt; he called to report the accident and went to assist. The girls' uncle, Lieutenant Palmer with the Madison City Police Department, arrived and the two removed Jennifer from the Jetta and laid her on the street. Jennifer was unconscious and was not breathing. Lieutenant Palmer performed rescue breathing, but was unable to revive Jennifer, who was transported to University Medical Center (UMC) and placed on life support. The Palmers arrived at UMC and were informed that Jennifer had received severe cervical and spinal injuries and could have no quality of life. Jennifer was taken off life support. Anne Palmer suffered minor injuries from the impact of the driver side air bag.
¶ 6. Prior to trial, Volkswagen admitted that the air bag caused Jennifer's fatal injuries. The trial occurred on March 9, 2002, in the Circuit Court for the First Judicial District of Hinds County. At the close of evidence, the Palmers' defective design and inadequate warnings claims were submitted to the jury. The jury unanimously found for Volkswagen on the defective design claim, and were divided eleven to one in their finding for Volkswagen on the inadequate warnings claim.

LAW AND ANALYSIS
¶ 7. We begin with the Palmers' evidentiary issues, which allege that the trial court erroneously admitted or excluded evidence. Our standard of review for a trial court's admission or exclusion of evidence is abuse of discretion. Terrain Enterprises v. Mockbee, 654 So.2d 1122, 1131 (Miss. 1995). In assessing the lower court's exercise of discretion, this Court must first determine whether the lower court applied the correct legal standard. Pierce v. Heritage Properties, Inc., 688 So.2d 1385, 1388 (Miss.1997). If so, the lower court must be affirmed unless there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." Id. In other words, we will affirm if the lower court's decision was "one of several reasonable ones which could have been made." Id.
¶ 8. "Further, for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a *573 party." Terrain Enterprises, 654 So.2d at 1131; M.R.E. 103(a). Thus, for this Court to reverse on the Palmers' evidentiary issues, first we must be convinced that the trial court abused its discretion, and then, that the ruling resulted in prejudice or harm to the Palmers, or adversely affected their substantial right. Id.
I. WHETHER THE TRIAL COURT ERRED IN EXCLUDING PORTIONS OF THE OWNER'S MANUAL INDICATING THAT CHILDREN MAY RIDE IN THE FRONT SEAT WITH A PICTORIAL OF A REAR FACING CHILD SEAT.
¶ 9. The Palmers argued that the 1995 Jetta's warnings were inadequate to advise them that, because of the danger posed by the air bag, Jennifer should not have traveled in the front seat. The 1995 Jetta was equipped with air bag warnings located on both the driver and passenger side sun visors and in the owner's manual. The sun visor warnings referred the reader to the owner's manual for additional information about air bags. In their depositions, the Palmers admitted that they had never noticed the Jetta's sun visor warnings and had never read the owner's manual. They averred, that, had the sun visor warnings been adequate, they would have noticed and heeded those warnings and sought further information from the owner's manual.
¶ 10. Prior to trial, Volkswagen filed a motion in limine to exclude a section of the owner's manual that concerned the Jetta's front passenger air bag. The section consisted of a picture and its caption. The picture depicted a small child in a rearward facing child seat on the front passenger seat. The caption stated, "Your child may travel on the front passenger's seat only if you have a child restraint system which is specifically designed and approved by the child restraint system manufacturer for use in the front together with the restraint system installed at that position." The picture and caption directly contradicted information located in the "Supplemental Air Bag System" section of the manual, that stated, "WARNING Never install rearward facing child seats or infant carriers on the front passenger seat," that doing so can cause serious injury to the child from an inflating air bag, and to always install rearward facing child seats in the rear seat.[1]
*574 ¶ 11. The trial court granted Volkswagen's motion in limine and excluded the picture and caption. The court held that the picture of a small child in a rear-facing child seat placed in the front passenger seat was not relevant. Alternatively, the court held that the picture's probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Before trial, the Palmers moved to exclude the entire manual, and the court elaborated on its relevancy ruling by adopting Volkswagen's arguments on the issue. These were that the picture and caption were not relevant because (1) this case involved a ten-year-old in the passenger seat, not a small child in a rear-facing child seat in the passenger seat; and (2) the Palmers admitted that they never read the owner's manual sections on air bags and safety belts and, therefore, they did not rely on the excluded material and were not misled by it.
¶ 12. During trial, the court also excluded the caption because it accompanied the excluded picture. The court admitted the original owner's manual without the picture and caption. This was accomplished by removing the page on which the excluded material appeared, and replacing it with a copy of the same page with a blank space in place of the excluded material.
¶ 13. We begin by reviewing the trial court's relevancy ruling. Mississippi Rule of Evidence 401 states, "`relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The comment to Rule 401 states that, if the evidence has any probative value at all, the rule favors its admission. All relevant evidence is admissible pursuant to Rule 402, unless the court finds it is more prejudicial than probative under Rule 403.
¶ 14. The Mississippi Products Liability Act (MPLA) provides the elements the Palmers were required to prove to succeed in their inadequate warnings claim. Miss.Code. Ann. § 11-1-63 (Rev. 2002). Thus, the MPLA provides insight into what facts are of consequence to the determination of the Palmers' warnings claim. Mississippi Code Annotated section 11-1-63 states,
(c)(i) In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.
(ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstance would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common *575 to an ordinary consumer who purchases the product....
Miss.Code Ann. § 11-1-63 (Rev.2002).
¶ 15. From this we see that an essential "fact of consequence" to the determination of this action was whether or not the warning complied with the adequacy standard contained in section 11-1-63(c)(ii). "The issue of a warning's adequacy is factual and usually will be resolved by the trier of fact." Wyeth Laboratories, Inc. v. Fortenberry, 530 So.2d 688, 692 (Miss.1988). The substance of the allegedly inadequate warning itself is vital to making this determination.
¶ 16. The trial court found that the excluded material depicting a small child in a rearward facing passenger seat was not similar enough to the instant case to be relevant. We find that this ruling constituted an abuse of discretion. The dissimilarities cited by the trial court between the excluded material and the facts of this case are insufficient to erode the logically probative value of the substance of a warning in an inadequate warnings case. The Palmers were attempting to show that the Jetta's warnings were not adequate under the statute to warn of the danger of allowing a ten-year-old child to travel in the front passenger seat. The picture and caption would have showed that, had the Palmers read the manual, they would have encountered a picture of a child in the front passenger seat. From that fact, it may reasonably be inferred that the Palmers would have thought that if a small child may safely ride in the front passenger seat in a rearward facing child seat with its head positioned close to the air bag, a larger, ten-year-old child may safely ride in the front seat. Alternatively, it may reasonably be inferred that the Palmers would have been confused by the Jetta's air bag warnings due to the contradiction between the picture and caption and the manual's instructions to always place children in the rear. Thus, the evidence of the picture and caption tended to make a fact of consequence, specifically, the adequacy of the warning, more probable or less probable than without that evidence. The court's relevancy ruling was also inconsistent with its admittance of the rest of the manual, which included restraint system warnings for adults, as well as obviously less relevant information on various aspects of the Jetta other than the restraint system.
¶ 17. Further, the court could not exclude the material as irrelevant based upon the Palmers' admission that they did not rely upon any information in the owner's manual. This is because reliance on the manufacturer's warning is not an element of an inadequate warnings case.[2] *576 Miss.Code Ann. § 11-1-63 (Rev.2002). The Palmers introduced evidence that they would have noticed and heeded an alternative warning. Wolf v. Stanley Works, 757 So.2d 316, 322-23 (¶ 25) (Miss.Ct.App. 2000).
¶ 18. Finally, we find that the court's relevancy ruling contravened Mississippi Rule of Evidence 106, which codifies the evidentiary rule of completeness. Rule 106 states, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The purpose of Rule 106 is "to avoid misleading the factfinder [sic] by introducing only a fragment of an utterance out of context. . . ." Kniep v. State, 525 So.2d 385, 390 (Miss.1988).
¶ 19. In Kniep, the supreme court applied Rule 106 to reverse the trial court's exclusion of a portion of an autopsy report containing an opinion on a cause of death that favored the defendant. Id. at 390-91. The court held that, because cause of death was a central issue in the case and a fact question for the jury, the entire autopsy report should have been admitted for the jury's consideration. Id. The court held that the trial court's admission of a portion of an autopsy report favoring the State's theory of the cause of death, without the portion favoring the defendant, misled the jury about a central issue in the case. Id. The court further held that the error prejudiced the defendant. Id. at 391.
¶ 20. Volkswagen argues that Rule 106 is inapplicable because the rule contemplates that the entirety of the document is otherwise relevant under the Rules of Evidence. Volkswagen is incorrect. The purpose of Rule 106 is to allow admission of relevant documentary evidence in context. Kniep, 525 So.2d at 390. It functions as an independent avenue for documentary relevancy; when one portion of a document is admitted, all other portions of the document that "ought in fairness to be considered contemporaneously with it" become relevant to show context and to avoid misleading the jury.
¶ 21. The adequacy of the Jetta's warnings was a central issue in this case. The trial court's ruling allowed Volkswagen to introduce only the portion of the manual tending to show the warnings were adequate, while excluding the portion of the manual that indicated otherwise. Even if the picture and caption were not independently relevant, their exclusion was error under Rule 106 because the jury was misled about what information was contained in the owner's manual.
¶ 22. We now turn to the trial court's alternative holding that the picture and caption were more prejudicial than probative under Rule 403. Under Rule 403, the trial court must conduct on the record balancing of probative value and prejudice. Hageney v. Jackson Furniture of Danville, Inc., 746 So.2d 912, 920 (¶ 34) (Miss.Ct.App.1999). To exclude relevant evidence under the rule, the trial court must find that potential prejudice to a party substantially outweighs the probative value of the evidence. Mississippi *577 Power and Light v. Lumpkin, 725 So.2d 721, 732-33 (¶ 55) (Miss.1998).
¶ 23. On appellate review of a lower court's application of Rule 403, we do not "engage anew in the 403 balancing process," rather, our review is limited to determining "whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence." General Motors Corp. v. Jackson, 636 So.2d 310, 314 (Miss.1992) (quoting Foster v. State, 508 So.2d 1111, 1118 (Miss.1987) (overruled on other grounds)). The trial court's order granting Volkswagen's motion in limine stated that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Before trial, the court stated the picture would unfairly prejudice Volkswagen because it would be "confusing and for the reasons cited by Volkswagen."
¶ 24. Volkswagen's primary argument for exclusion was that the picture would confuse the jury because it conflicted with the other warnings in the owner's manual. This argument alone and in the absence of any explanation by the trial court did not establish a "danger of unfair prejudice" under Rule 403. "It is inherent that nearly all evidence is prejudicial to a party in one way or another." Abrams v. Marlin Firearms Co., 838 So.2d 975, 981 (¶ 22) (Miss.2003). That the Jetta's warnings were confusing or misleading was exactly what the Palmers were trying to prove in their inadequate warnings claim. A party is entitled to argue that an item of evidence is confusing or misleading as a matter of fact. Rule 403 exclusion is proper only for evidence that might mislead or confuse the jury by suggesting a decision on an emotional or other improper basis, and no improper basis was referenced by the trial court. Id.
¶ 25. Volkswagen also argued that the picture could have confused the issues by encouraging the jury to find for the Palmers to punish Volkswagen for misleading other parents, not parties to this litigation, that child safety seats could be placed in the front. Though the court never explicitly referenced this argument, we address it because the court adopted Volkswagen's reasoning as support for its holding. We find that, due to the strong probative value that the substance of a warning has in an inadequate warnings case, rather than excluding the evidence, the court could have averted this danger by giving an instruction limiting the jury's consideration of the owner's manual to the Palmers' claim.
¶ 26. The trial court's exclusion of the picture and caption as more prejudicial than probative was an abuse of discretion. The error substantially prejudiced the Palmers by allowing the defense to present the warnings that supported its position, while excluding those warnings that supported the Palmers' claim under the MPLA.
II. WHETHER THE TRIAL COURT ERRED IN EXCLUDING THE SPECIAL CRASH INVESTIGATION REPORT REGARDING THE SUBJECT ACCIDENT.
A. Trial court's refusal to admit the report into evidence
¶ 27. The National Highway Transportation and Safety Administration (NHTSA) contracted with Calspan, an independent, non-government, crash investigator, to investigate the accident. The results of the investigation were published in a Special Crash Investigation (SCI) report, which contained detailed factual findings about the accident. Prior to trial, Volkswagen filed a motion in limine to exclude the SCI report. The Palmers argued the report was admissible under Mississippi *578 Rule of Evidence 803(8)(C), which provides an exception to the hearsay rule for public records.
¶ 28. The trial court granted Volkswagen's motion in limine for the reasons stated by Volkswagen. Again, we must examine Volkswagen's arguments in order to review the trial court's ruling. The following language appeared on the second page of the SCI report:
This document is disseminated under the sponsorship of the Department of Transportation in the interest of information exchange. The United States Government assumes no responsibility for the contents or use thereof.
The opinions, findings, and conclusions expressed in this publication are those of the authors and not necessarily those of the National Highway Traffic Safety Administration.
The crash investigation process is an inexact science which requires that physical evidence such as skid marks, vehicular damage measurements, and occupant contact points be coupled with the investigator's expert knowledge and experience of vehicle dynamics and occupant kinematics in order to determine the pre-crash, crash, and post-crash movements of involved vehicles and occupants.
Because each crash is a unique sequence of events, generalized conclusions cannot be made concerning the crashworthiness of the involved vehicle(s) or their safety systems.
¶ 29. Volkswagen argued that the report should be excluded because the disclaimer rendered the report untrustworthy, the report contained hearsay, the report had not been properly authenticated, the report contained opinions of undesignated experts, or that the report was more prejudicial than probative.
¶ 30. The Palmers offered the SCI report for the truth of its conclusions; therefore, the report constituted hearsay and was inadmissible unless it fell within an exception to the hearsay rule. M.R.E. 801; M.R.E. 802. Mississippi Rule of Evidence 803(8)(C) contains a hearsay exception for "records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." By adopting Volkswagen's arguments, the trial court found that the report did not fit within this hearsay exception because its disclaimer rendered it untrustworthy. The disclaimer by the non-government crash investigator that authored the report established that the NHTSA did not necessarily accept the report as its own findings. The trial court was within its sound discretion in finding that the disclaimer rendered the report untrustworthy as a public record and, therefore, was not excepted from the hearsay rule. M.R.E. 803(8).
B. Trial court's refusal to allow experts to rely on the SCI report
¶ 31. The trial court did not allow the Palmers' experts, Taras Rudnitsky and James Hannah, to rely on the SCI report to form opinions on the ground that the report had been excluded from evidence. Mississippi Rule of Evidence 703 states the permissible sources of an expert's facts or data. The rule provides "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."
*579 ¶ 32. Rule 703 makes clear that, when a party seeks to introduce expert testimony relying on facts or data, the trial court should inquire whether the facts or data are "of a type reasonably relied upon by experts in the particular field." In Fielder v. Magnolia Beverage Co., 757 So.2d 925, 929 (¶ 11) (Miss.1999), our supreme court stated that this should be accomplished by determining if the facts or data "afford a reasonably accurate basis" for the expert's conclusion. "Expert testimony must be consistent with scientific principles as established by the laws of physics or mechanics," and "must be generally accepted by practitioners in the expert's field." Id. See also In re TMI Litigation, 193 F.3d 613, 697 (3d Cir.1999) (stating that the key inquiry under F.R.E. 703 is that the facts or data be of the type reasonably relied upon by experts in the field).
¶ 33. Notably, the proper legal analysis has nothing to do with whether or not the basis for the opinion is admissible, because Rule 703 specifically states that the basis need not be admissible. Rather, the focus is on the reliability of the basis for the opinion. In the case sub judice, the trial court disallowed expert reliance on the SCI report on the sole ground that the report was inadmissible. The ruling was based on an incorrect legal standard, and constituted an abuse of discretion.
¶ 34. We turn to whether the error warrants reversal. Hannah's proffered testimony was repetitive of previous testimony of another of the Palmers' experts, and excluded as cumulative. See Issue VI B. Thus, the Palmers were not harmed because the testimony was excluded on another ground. Taras Rudnitsky's testimony relying on the SCI report did not prejudice the Palmers. Rudnitsky was the Palmers' expert on air bag design. The Palmers proffered that Rudnitsky would have relied upon the SCI report for the measurement of velocity change during the subject accident, Jennifer's seat position, and the location of the seating in the Jetta prior to the deployment of the air bag. Rudnitsky was able to render opinions based on other information, outside the SCI report, of the velocity change measurement and seat positioning. The Palmers suffered no prejudice from the error because Rudnitsky was able to testify to the same conclusions based on other information.
III. WHETHER THE TRIAL COURT ERRED IN EXCLUDING THE NATIONAL TRANSPORTATION SAFETY BOARD'S SAFETY RECOMMENDATIONS OF NOVEMBER 2, 1995 TO VOLKSWAGEN.
¶ 35. The warnings on the Jetta's sun visors featured certain language required by NHTSA in accordance with Federal Motor Vehicle Safety Standard 208 (FMVSS 208). The National Transportation and Safety Board (NTSB) is an independent federal agency that promotes transportation safety by conducting investigations and formulating safety improvement recommendations. On November 2, 1995, NTSB sent a letter to Volkswagen and other car manufacturers informing them of seven accidents in which children were killed or seriously injured by deploying air bags. The letter opined that the sun visor warnings mandated by FMVSS 208 were not actually notifying parents about the danger of placing children in the front passenger seat. The letter recommended that manufacturers promptly conduct a mail campaign to contact all customers owning cars with front passenger air bags and warn them of the danger of placing rearward-facing child seats or unrestrained small children in the front passenger seat.
*580 ¶ 36. The Palmers attempted to use this letter to cross-examine Volkswagen's expert, Alan Dorris. The trial court excluded the letter. The court held that the letter was not relevant because NTSB acts in an advisory capacity only and has no regulatory authority over Volkswagen. The letter was placed in the record for identification only.
¶ 37. The Palmers argue that this ruling was error and that they were improperly prohibited from cross-examining Volkswagen's experts. Volkswagen contends that the Palmers failed to preserve this issue for appeal because the record does not show that the Palmers proffered the questions they intended to ask Volkswagen's experts about the letter. Under Mississippi Rule of Evidence 103(a), preservation of error based on a ruling excluding evidence requires that the "substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." However, the general rule that a party must place in the record the substance of the proffered evidence has no application when a party is improperly prohibited from cross-examination. Harris v. Buxton T.V., Inc., 460 So.2d 828, 833 (Miss.1984). See M.R.E. 103 cmt. "This is because, as a matter of common sense, the party would seldom know precisely what cross-examination would reveal." Harris, 460 So.2d at 833-34. The general substance of the evidence is apparent from the letter itself. The issue was preserved for appeal.
¶ 38. The Palmers argue that the letter was relevant to show that Volkswagen had notice that its warnings were ineffective. Mississippi Code Annotated section 11-1-63 provides that a manufacturer or seller can be held liable for failure to warn of a dangerous condition it knew or reasonably should have known of at the time the product left the manufacturer's or seller's control. The Palmers leased the Jetta on January 27, 1995. The NTSB letter to Volkswagen was dated November 2, 1995, approximately nine months after the Jetta "left the manufacturer's or seller's control." The letter was sent after the Palmers leased the Jetta, and Volkswagen's post-lease notice of a dangerous condition was not relevant to show that Volkswagen breached its duty to warn under the MPLA. See Issues XV and XVI.
¶ 39. The NTSB letter contained an opinion that efforts to inform and educate the public about the dangers of air bags were not reaching parents, and recommended a media campaign. The Palmers argue that this was relevant to rebut testimony of Volkswagen's expert that there was widespread public awareness about air bag precautions. This expert testimony was one of several instances when Volkswagen offered evidence of public awareness in its effort to prove its defense that the air bag danger was open and obvious. Mississippi Code Annotated. section 11-1-63(e) provides that a manufacturer or seller shall not be liable for failure to warn of a "danger posed by the product that is known or is open and obvious to the user or consumer ... or should have been known or open and obvious to the user or consumer ... taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product."
¶ 40. The "open and obvious" danger defense does absolutely bar the plaintiff's recovery, but is a factor to be considered by the jury in determining whether a product is unreasonably dangerous. Hageney v. Jackson Furniture of Danville, Inc., 746 So.2d 912, 925-26 (¶ 54) (Miss.Ct.App. 1999). The defense centers on what the individual plaintiff knew or should have known during her use of the product. See id. at (¶ 56). Therefore, proof of this defense should not be restricted to the date *581 the product left the control of the manufacturer or seller.
¶ 41. The portions of the NTSB letter discussing public awareness were relevant to rebut Volkswagen's evidence that the general population was aware that air bags were dangerous to children riding in the front seat. This should have been apparent to the lower court because it allowed Volkswagen to introduce evidence of public awareness after the date the Jetta was leased, and instructed the jury on the open and obvious defense. The trial court should have made some effort to admit the relevant portions of the NTSB letter, provided they were otherwise admissible under the Rules of Evidence. M.R.E. 402. The trial court's finding that NTSB lacked regulatory authority over automobile manufacturers had nothing to do with the relevance of the letter to show lack of public awareness. We find that the trial court's relevancy ruling constituted an abuse of discretion.

IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING VIDEOS OF LITIGATION TESTING.
¶ 42. Volkswagen offered three videos prepared for the litigation. The videos depicted several sled tests with a ten-year-old size dummy, belted and unbelted, in crashes with and without air bag deployment.
¶ 43. The Palmers argued that the videos were intended to recreate the subject accident but failed to accurately depict the accident. Volkswagen argued that the videos were not intended to recreate the subject accident, but only to illustrate occupant kinematics. Occupant kinematics refers to the movement of persons inside a vehicle during a crash. Volkswagen argued that the videos were relevant to rebut portions of the Palmers' expert testimony that Jennifer would not have sustained fatal injuries had she been wearing a seat belt, and that she would have been at risk for serious injury in the accident even if the air bag had not deployed. The trial court found that the videos should be shown to the jury for demonstrative purposes. The court stated, "the court believes they are relevant to show the occupant kinematics in the same or substantially the same type situation," and admitted the videos into evidence.
¶ 44. The Palmers point out numerous differences between the sled test videos and the evidence presented about the subject accident. The first video showed an unbelted dummy in close proximity to the air bag to show that injury can occur when the person is too close to the air bag. The sled test began with the dummy's head resting on the air bag module. The test employed a 16 mile per hour velocity change during the crash. The Palmers point out that Jennifer was in her seat at the beginning of the subject accident, and the velocity change of the subject accident was unknown.
¶ 45. The second video featured a properly belted dummy to show that no fatal injuries were received by the properly belted dummy when the air bag deployed. The dummy did not have a feature for recording neck injuries. This sled test did not involve pre-impact braking. There was evidence that, in the subject accident, Anne Palmer applied her brakes before the collision.
¶ 46. The third video showed an unbelted dummy without air bag deployment that received fatal injuries to show that Jennifer would have been killed even if the Jetta had no air bag. This test used a velocity change of 18.21 miles per hour. At the beginning of the test, the dummy's arms were positioned behind its back. The car seat was in rearward position. In the subject accident, Jennifer's arm position was unknown and her seat was in middle position.
*582 ¶ 47. The Palmers argue that, due to the differences between the videos and the subject accident, the videos were likely to mislead the jury despite cross-examination. The case of Pittman v. Miss. Power and Light Co., 368 So.2d 238 (Miss.1979), discussed admissibility of motion pictures created for litigation. Pittman was a suit for the wrongful death of a man killed when his tractor hit a light pole and the pole broke and fell on him. Id. at 239. The plaintiffs argued that the defendant negligently maintained the pole. Id. The trial court admitted a video prepared by the defense for the litigation. Id. A defense expert testified that the video was made in an attempt to recreate the subject accident, but that some factors in the video were different. Id. On appeal, the defense argued that the purpose of the test was not to exactly recreate the accident, but to simulate certain factors to show that a new pole would also have broken. Id. The supreme court reversed. Id. at 240. The court found that the video was not relevant and was prejudicial to the plaintiffs because of "a number of material variations between the actual event and the reconstructed event." Id. The court pointed to specific factors from the video that were "incapable of being reasonably duplicated" because they were unknown, such as the speed of the tractor when it hit the pole and the point of impact. Id. Further, an expert had testified that the video attempted to recreate the accident. Id.
¶ 48. In the instant case, Volkswagen's expert testified that the sled test videos were not intended to simulate the subject accident. Volkswagen admits that the purpose of the first sled test video was to show the injuries a ten-year-old would receive from being positioned too close to the air bag. The other test videos incorporated aspects of the subject accident, for example, using a ten-year-old dummy. These tests altered two aspects of Jennifer's accident by properly belting the dummy and removing the air bag. All three tests incorporated other variations from the subject accident. These variations involved disputed material facts, such as velocity change, which was hotly disputed during the trial. These variations from the subject accident, involving disputed facts, supported Volkswagen's theories about the subject accident and helped assure the results of the sled tests supported Volkswagen's arguments.
¶ 49. We find that, as in Pittman, the differences between the litigation videos and the subject accident rendered the videos irrelevant. Pittman, 368 So.2d at 240. The jury could have concluded, due to the numerous similarities between the sled tests and the accident, such as the ten-year-old dummy, that the sled tests showed what definitely would have happened had Jennifer been belted or had there been no air bag during the accident. This conclusion would have been erroneous because the tests incorporated a large amount of disputed data. Therefore, admission of the videos was highly prejudicial to the Palmers. The Palmers did cross-examine Volkswagen's expert about the differences between the videos and the accident that involved disputed material facts. In view of the highly technical nature of these disputed material facts, coupled with the persuasive nature of video testimony, we find that cross-examination was an insufficient mechanism for attacking the credibility of the three videos. The trial court's admission of the videos was an abuse of discretion.

V. WHETHER THE TRIAL COURT ERRED IN EXCLUDING PHOTOGRAPHS AND/OR DRAWINGS OF JENNIFER PALMER'S AIR BAG INDUCED INJURIES.
¶ 50. The trial court granted Volkswagen's motion in limine to exclude *583 autopsy photographs and diagrams of Jennifer's injuries. The photographs showed Jennifer on the autopsy table wearing only a diaper, and showed bruising to her neck and head. Other photographs were taken during the autopsy of her face with flesh removed. The photographs were taken by Dr. Stephen Hayne, who conducted the autopsy. Dr. Hayne also created the diagrams. The Palmers argue that exclusion of the photographs and diagrams was error because they would have assisted the jury in understanding the location and nature of Jennifer's injuries and the aggressive nature of the air bag.
¶ 51. Admission or exclusion of photographs is within the discretion of the trial court and will be upheld absent an abuse of discretion. Walker v. Graham, 582 So.2d 431, 432 (Miss.1991). In criminal cases, the supreme court has stated that "the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." Brown v. State, 682 So.2d 340, 353 (Miss.1996) (quoting Hart v. State, 637 So.2d 1329, 1335 (Miss.1994)). But, gruesome photographs with no evidentiary value that only arouse the emotions of the jury are inadmissible. Sharp v. State, 446 So.2d 1008, 1009 (Miss.1984).
¶ 52. In the instant case, the trial court found that the photographs of Jennifer were inflammatory. The court further found that the photographs would not assist the jury because the autopsy report was read into evidence and contained an extensive description of Jennifer's injuries. While visual information could have assisted the jury in understanding Jennifer's injuries, the photographs were graphic and the jury received information about her injuries via the autopsy report. The trial court's exclusion of the photographs of Jennifer was within the court's discretion. Walker, 582 So.2d at 432.
¶ 53. The diagrams showed sketches of an adult person with arrows drawn to show the parts of the body where Jennifer had been injured. They were not particularly graphic. The trial court found the diagrams would not assist the jury because of Dr. Hayne's thorough description of Jennifer's injuries in the autopsy report. This ruling was within the court's discretion to exclude cumulative evidence. M.R.E. 403.

VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE TESTIMONY OF PLAINTIFFS' WITNESSES.
¶ 54. The Palmers contend that the trial court improperly excluded certain testimony of Dr. Michael Wogalter, Officer James Hannah, Myra Kruckenburg and Dr. Stephen Hayne.

A. Dr. Michael Wogalter
¶ 55. The trial court accepted Dr. Michael Wogalter as an expert in human factors psychology in the area of warnings. On direct examination, Wogalter opined that the Jetta's warning labels did not comply with FMVSS 208. The Palmers' counsel asked Wogalter if he had any criticism of the ability of the Jetta's air bag warning labels to adequately warn a potential user or consumer. Dr. Wogalter stated that he did, and the Palmers' counsel attempted to question him about warnings of the dangers passenger air bags present to young children in the right front seat. Volkswagen objected, and the trial court excused the jury and held voir dire of Wogalter. Volkswagen's argument was that Dr. Wogalter should not be permitted to apply his warnings knowledge to those dangers because he lacked expert knowledge about air bags.
*584 ¶ 56. Dr. Wogalter stated that he had studied about air bags in the past and for this case, and had learned that the particular danger posed by passenger air bags to children is that they could be killed or severely injured if seated in the air bag's deployment area. He stated that, if allowed, he would testify that the Jetta's labels provided inadequate warning of this danger. Dr. Wogalter said that the generally accepted methodology for human factors experts is to apply expert knowledge of human behavior to different types of problems. He stated that a human factors expert usually does not possess expert-level knowledge of each particular type of problem, but instead relies upon information prepared by other experts to form an idea of the danger involved.
¶ 57. The court found that, because Dr. Wogalter lacked expert knowledge about air bag engineering, he was incompetent to testify that a passenger side air bag presents a danger to children in the front seat. The court stated that in order to testify as to adequacy of warnings about a machine, the expert must have "good basic knowledge... of the type of equipment or machinery" that is the subject of the warning. The ruling prevented Dr. Wogalter from testifying to the existence of a danger and, therefore, prevented him from relating the Jetta's warning to the danger.
¶ 58. The Palmers argue that the ruling misapplied the Frye standard for admissibility of expert testimony under Mississippi Rule of Evidence 702. Though Rule 702 has since been amended to adopt the Daubert standard for admissibility of expert testimony, we address this issue under the Frye standard because it was applicable at the time of trial. See M.R.E. 702 cmt. (citing Frye v. U.S. 293 F. 1013, 1014 (1923)) (comment adopted effective January 1, 1986); M.R.E. 702 cmt. (citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (comment amended effective May 29, 2003)). At that time, Rule 702 stated, in its entirety: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In Wilson v. State, 574 So.2d 1324, 1334 (Miss.1990), the court stated, "in considering the admissibility of an expert's testimony, we ask: `[i]s the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion? Where the answer to this question is in the affirmative, we generally allow expert testimony.'"
¶ 59. In Wilson, the defendant argued that the trial court improperly admitted a fingerprint expert's testimony about background materials lifted with latent prints. Id. at 1333-34. The defendant argued that analysis of background materials was a novel scientific theory for which there is no general acceptance. Id. at 1334. The supreme court affirmed the trial court, holding that "the practice of fingerprint examination necessarily involves the observation and comparison of background materials lifted with the latent prints. It is an integral part of fingerprint examination." Id.
¶ 60. In the case sub judice, the trial court held that Wogalter's qualification as a general warnings expert did not enable him to testify as to the warning in this particular case. We note that Wogalter was not attempting to enumerate dangers of air bags, or to describe the mechanics of how such dangers operate, topics which would have been outside his field of expertise as a warnings expert. Rather, Wogalter *585 was trying to state that there was a danger of the kind that killed Jennifer Palmer to be warned about. His ability to so state would have enabled him to testify that the Jetta's warning was inadequate to convey deadly danger to children.
¶ 61. We examine whether the trial court correctly held that the proffered opinion was outside Wogalter's field of expertise. Wogalter's testimony and that of Volkswagen's warnings expert, Alan Dorris, established that the generally accepted methodology for a human factors warnings expert is to apply expert-level knowledge of warnings to different types of dangers. It appears to this Court that this practice of applied knowledge is integral to warnings expertise because a warning expert's ability to testify as to the adequacy of a warning depends on the existence of the danger the warning is intended to avert. It would be impractical to require warnings experts to possess expert-level knowledge of each type of danger.
¶ 62. Wogalter possessed an amount of knowledge sufficient for him to competently state that air bags posed a danger to children in the front seat. A high level of knowledge about the mechanics of the danger was not required because such knowledge was irrelevant to whether Wogalter could observe that air bags present a danger to children in the front seat. Wogalter read several studies and articles, and viewed videos prepared by Volkswagen that indicated there was a danger to children from air bags. The 1995 Jetta's warning labels provide proof such a danger existed. Moreover, a child was killed by a passenger side air bag in this case.
¶ 63. The trial court allowed Volkswagen's warnings expert, Dr. Dorris, to testify about warnings of dangers to children posed by air bags, without establishing that he was an expert on air bags. Unlike Wogalter, Dorris was permitted to testify from the premise that a danger existed to be warned about. The trial court committed a clear error of judgment in excluding Wogalter's testimony relating the Jetta's warning to the danger of its air bag. The error was not harmless. Wogalter was the Palmers' sole warnings expert, and the substance of his testimony did not come in through any other route. The Palmers were substantially prejudiced by the error.

B. Officer James Hannah
¶ 64. The Palmers offered the expert testimony of Officer James Hannah as an accident reconstructionist. The trial court refused to admit Hannah's testimony because it partially relied on the SCI report that had been excluded from evidence, and because it was cumulative since the Palmers' other accident reconstructionist, Dr. Bruno Schmidt, had testified to the same conclusions that Hannah reached.
¶ 65. As previously discussed in Issue II. B., the fact that the SCI report was excluded from evidence, without more, was an erroneous ground for exclusion of expert testimony. Under Mississippi Rule of Evidence 703, the proper inquiry for determining whether to allow an expert to base an opinion on inadmissible evidence is whether the inadmissible evidence is of a type reasonably relied upon by experts in the field.
¶ 66. The trial court's other ground for excluding Hannah's testimony was that it was cumulative and would be a waste of time. Hannah's proffered testimony indicates that his conclusions were the same as those in Dr. Schmidt's earlier testimony. Mississippi Rule of Evidence 403 allows the trial court discretion to exclude cumulative expert testimony. Knotts by Knotts v. Hassell, 659 So.2d 886, 891 (Miss.1995). The trial court was within its discretion in excluding Hannah's testimony from evidence.

*586 C. Myra Kruckenburg
¶ 67. Myra Kruckenburg had been the Palmers' grief counselor since Jennifer's death. The Palmers designated Kruckenburg as an expert and lay witness. The trial court excluded Kruckenburg's expert testimony because it was outside the scope of the Palmers' expert designation under Mississippi Rule of Civil Procedure 26(b)(4), because Volkswagen never deposed Kruckenburg, and because Volkswagen would have been unfairly prejudiced by Kruckenburg's testimony because she did not keep any treatment records. The Palmers proffered that Kruckenburg would have testified to the treatment provided to the Palmers, how depression has affected them, their medications and the medications' effect on them, and the strain on the Palmers' marriage. Later, the trial court excluded Kruckenburg's lay testimony about the Palmers' grief, anxiety, and depression because it would have been cumulative of the Palmers' testimony on these subjects.
¶ 68. The trial court's first basis for its ruling was the Palmers' failure to provide adequate Rule 26(b)(4) expert discovery. We may reverse a trial court's discovery ruling only where the trial court has abused its discretion. Harkins v. Paschall, 348 So.2d 1019, 1022 (Miss.1977). Rule 26(b)(4) prescribes the rule for discovery of facts known and opinions held by experts. The rule states:
A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.
M.R.C.P. 26(b)(4)(A)(i). The trial court may order further discovery on its own motion. M.R.C.P. 26(b)(4)(A)(ii). In Nichols v. Tubb, 609 So.2d 377, 384 (Miss.1992), the court stated that Rule 26(b)(4) requires that the substance of every fact and every opinion be disclosed, including meaningful information which will enable the opposing side to meet the testimony at trial. Further, the exact ground upon which each opinion is based must be disclosed. Id. If opinions are based on the expert's own experience, the response should so state. Id.
¶ 69. The Palmers' Rule 26(b)(4) response about Kruckenburg's testimony consisted of one sentence stating that the Palmers may call Kruckenburg as a fact and expert witness on "the extent and nature of injuries sustained by Plaintiffs, Randal Palmer, Lynn Palmer, and Ann [sic] Palmer, as well as the treatment rendered." This response only briefly stated the substance of Kruckenburg's expert opinion. The response completely failed to state grounds for the opinion, whether the ground was Kruckenburg's experience or otherwise. Thus, the Palmers' response did not comply with the requirements of Rule 26(b)(4)(A)(i). The response was incomplete and amounted to a failure to answer. M.R.C.P. 37(3). The Palmers could have attempted to correct the deficiency by supplementing prior to trial, but they did not do so. M.R.C.P. 26(f)(1).
¶ 70. The Palmers' response also stated that the Palmers did not have Kruckenburg's curriculum vitae, but would supplement as soon as it was obtained. The parties' attorneys communicated approximately one week before trial, when the Palmers' attorney informed Volkswagen's attorney of their definite intention to use Kruckenburg, and faxed him her curriculum vitae. At a bench conference at trial, the attorneys agreed that, during *587 that conversation, Volkswagen's attorney declined to depose Kruckenburg and expressed satisfaction with Kruckenburg's expert designation.
¶ 71. Mississippi Rule of Civil Procedure 26(b)(4) is rigidly enforced, and failure to comply with the rule or supplement means that the proponent of evidence may be sanctioned by having the expert testimony stricken by the court pursuant. Warren v. Sandoz Pharmaceuticals Corp., 783 So.2d 735, 742 (¶¶ 15-16) (Miss.Ct.App. 2000). However, a party unhappy with an incomplete discovery response must provide the proponent with some means of notice of the insufficiency before sanctions may be imposed. Id. at (¶ 16). If the proponent fails to cooperate, the opposing party should file a motion to compel discovery under Rule 37(a)(2). Id. at (¶ 17) (citing Caracci v. International Paper Co., 699 So.2d 546 (¶ 19) (Miss.1997)). The rule prevents trial by ambush. Id. at (¶ 16).
¶ 72. In this case, Volkswagen was on notice that Kruckenburg might testify, but never sought clarification of the Palmers' inadequate response and declined to depose Kruckenburg. A party complaining of inadequate discovery must move the trial court to compel more complete discovery before the court may exclude expert testimony. Id. at (¶ 18). Volkswagen had the burden to request further discovery or file a motion to compel, but it failed to complain until the trial. See id. Because Volkswagen did not meet its burden, the trial court erred by excluding Kruckenburg's testimony on this ground.
¶ 73. The trial court found that Volkswagen would be unfairly prejudiced by Kruckenburg's expert testimony because she did not keep any treatment records and, therefore, Volkswagen had no documentation to examine in preparation for her testimony. Kruckenburg was designated on May 17, 2000, and the trial occurred on March 14, 2001. One week before trial, the Palmers informed Volkswagen that Kruckenburg would definitely testify. The trial court was within its discretion to find that Volkswagen would be prejudiced by this testimony because of the absence of treatment records for it to review.
¶ 74. It was within the trial court's discretion to prevent Kruckenburg from testifying as a lay witness. The Palmers' proffer indicated that Kruckenburg would have testified to the same information as a lay witness as she would have as an expert. This information was gleaned in her role as the Palmers' grief therapist and consisted of expert opinions. Thus, it was admissible only as expert testimony.

D. Dr. Stephen Hayne
¶ 75. Dr. Stephen Hayne conducted the autopsy of Jennifer Palmer. Before Dr. Hayne's deposition was read into evidence, Volkswagen objected to Dr. Hayne's statement that he would not expect to see a fatality in a 20 mile per hour crash. The trial court excluded the statement because the Palmers' Rule 26(b)(4) response did not include the opinion or show that Dr. Hayne was qualified to express it. The Palmers argue that the ruling was incorrect because Dr. Hayne was qualified to render the opinion, and that they were prejudiced by the ruling because the statement was their sole evidence to rebut Volkswagen's expert testimony that "thousands of fatalities occur down below 20 miles an hour."
¶ 76. The Palmers' Rule 26(b)(4) response regarding Dr. Hayne stated that Dr. Hayne's post-mortem report had already been given to Volkswagen. The response further stated that Dr. Hayne may be called as a fact and expert witness to state "the extent and nature of injuries sustained by Jennifer Palmer" and that "the cause of death of Jennifer Palmer was *588 the deployment of the air bag." The Palmers did not provide Volkswagen with Dr. Hayne's opinion that he would not expect to see a fatality in a crash below 20 m.p.h. The response failed to state the substance of Dr. Hayne's testimony and did not comply with Mississippi Rule of Civil Procedure 26(b)(4)(A)(i). See Issue VI(C). Because the response stated only the two opinions and referenced the autopsy report, Volkswagen was not on notice that Dr. Hayne would testify to additional information beyond the opinions and the autopsy report. The trial court's exclusion of Dr. Hayne's testimony for failure to comply with Rule 26(b)(4) was within its discretion.
¶ 77. The qualification of an expert is within the sound discretion of the trial judge, and will not be overturned absent clear error. While Dr. Hayne had performed over 18,000 autopsies, several thousand of which were motor vehicle collision autopsies, the opinion was arguably outside Dr. Hayne's field of expertise as a pathologist. The trial court acted within its discretion in finding Dr. Hayne was not qualified to offer the opinion, and his testimony was already properly excluded based on the discovery violation.

VII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO EXCLUDE THE TESTIMONY OF GREG MILLER, JOHN MELVIN AND ALAN DORRIS.

A. Greg Miller
¶ 78. Greg Miller was a former employee of TRW Vehicle Safety Systems, Inc. (TRW), the manufacturer of the 1995 Jetta's air bags. Miller was designated by Volkswagen as an expert witness to rebut the testimony of the Palmers' design expert, Taras Rudnitsky. Miller's expert designation indicated that Miller would offer opinions and comparisons of the Jetta's air bag system and the systems of other vehicles.
¶ 79. The Palmers objected to Miller's expert testimony because Volkswagen untimely designated Miller as an expert and the Palmers were unable to depose him. The trial court sustained the objection and allowed Miller to testify as a lay witness only. The court ruled that Miller could offer fact testimony in his capacity as a former manager of product analysis at TRW, but that he could not offer any opinions or make any comparisons. At trial, Miller thoroughly explained the mechanics of tank testing an air bag's inflator for aggressiveness.[3] He explained how to read a chart of a tank test curve. Then, Miller calculated peak pressure and rise rate of the tank test curve of the 1995 Jetta inflator, and charted them on graphs.
¶ 80. The Palmers argue that Miller's testimony amounted to impermissible expert testimony by a lay witness. At the time of trial, Mississippi Rule of Evidence 702 articulated the following standard for admitting expert testimony: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in *589 issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Mississippi Rule of Evidence 701 states the standard for admitting opinions by lay witnesses. At the time of trial, Rule 701 stated: "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue." Rule 701 has since been amended. The amendment was accomplished to clarify that Rule 701 is "not an avenue for admission of testimony based on scientific, technical or specialized knowledge" that can only be admitted under Rule 702. See M.R.E. 701 cmt. (amended effective May 29, 2003).
¶ 81. The reason for the different standards for lay and expert testimony is that expert testimony is subject to special discovery rules to "allow the opposing party ample opportunity to challenge the witness' qualifications to render such opinion before the question soliciting opinion is posed in front of the jury." Sample v. State, 643 So.2d 524, 530 (Miss.1994). This consideration was implicated in the instant case because the trial court found that the Palmers had no opportunity to challenge Miller's qualifications as Miller was untimely designated.
¶ 82. In Sample v. State, our supreme court stated that, while there is a very thin line between lay testimony and expert opinion, there is a bright line rule: "[t]hat is, where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a Rule 702 opinion and not a Rule 701 opinion." Id. at 529-30. Miller's explanation of how tank testing works, and his calculation of the Jetta's peak pressure and rise rate from the tank test curves certainly required experience or expertise beyond that of the average, randomly selected adult. His testimony regarding the tank test curves was extremely technical. It was expert testimony. The trial court abused its discretion by allowing Miller's testimony to stray into the realm of scientific, technical and specialized knowledge that only could be admitted as expert testimony after assessment pursuant to Rule 702.
¶ 83. Further, the Palmers were prejudiced by Miller's impermissible expert testimony because Miller's testimony rebutted that of the Palmer's expert, Rudnitsky. Rudnitsky opined that the average air bag inflator rise rate was 6 kilopascals per millisecond, and that the Jetta inflator's rise rate was 10.5 kilopascals per millisecond. He stated that this was 84% higher than average for 1995 cars. He also stated that the Jetta's peak pressure was 26% higher than average for 1995 cars. He concluded that the Jetta's air bag was overly aggressive. Miller calculated and charted the 1995 Jetta inflator's peak pressure and rise rate at three different temperatures. He averaged the three peak pressures and arrived at an average rise rate of 6.7 kilopascals per millisecond. He averaged the three rise rates and arrived at an average rise rate of 211 kilopascals. Rudnitsky's higher calculations were offered to show that the Jetta's air bag was aggressive, and Miller's lower calculations of the Jetta's peak pressure and rise rate were offered to rebut Rudnitsky's conclusions. The trial court had already held that the Palmers were unprepared for expert testimony by Miller.

B. John Melvin
¶ 84. Like Miller, John Melvin was also untimely designated by Volkswagen and limited to lay testimony by the *590 trial court. Again, the Palmers argue that the trial court allowed the witness' lay testimony to stray into the area of expert testimony.
¶ 85. Melvin formerly worked as a biomechanical expert at General Motors. He was a member of the Performance Assessment Committee (PAC), an advisory committee that developed the criteria that restraint system engineers should consider in developing air bag systems. The committee was previously mentioned at trial by Taras Rudnitsky, who testified that the committee refused to implement his recommendation of a higher deployment threshold.
¶ 86. Melvin testified that engineers would present air bag restraint system components to the PAC. He did not recall that Rudnitsky ever presented his idea. He testified that the PAC never considered cost, but only performance. He further testified that if an idea was presented, it would have been evaluated and, if significant, transmitted to all the performance engineers in the company. He identified the all-fire and no-fire thresholds for GM cars in the 1990s.[4] He testified that these ranges were set by considerations of timely deployment in different crashes. Melvin stated, "And the crash sensors have to figure out that this is a crash that needs an air bag and do it in the proper amount of time so that it will act as a restraint system." After objection to this sentence, the court stated that this was factual information. Melvin further testified about considerations that go into setting the thresholds. Then, Melvin identified the air cushion restraint system used by GM from 1973 to 1976, and identified its components.
¶ 87. Melvin's testimony centered on his membership in the PAC. His explanation of how the PAC worked was offered to rebut the testimony of Rudnitsky about the PAC. That portion of Melvin's testimony was lay testimony. But, Melvin's testimony on how the air bag system works was expert testimony. While the testimony was factual and did not consist of an opinion, it constituted specialized knowledge beyond that of the ordinary person "in the form of an opinion or otherwise." M.R.E. 702 (emphasis added). It could only be admitted under Rule 702. As expert testimony, it was not admissible under Rule 701, and the trial court abused its discretion by allowing the testimony. However, admission of the testimony was harmless error. Melvin's description of how an air bag works was neutral information that did not harm the Palmers.

C. Alan Dorris
¶ 88. The Palmers make three arguments on appeal regarding the testimony of Volkswagen's warnings expert, Alan Dorris.

1. Dorris' qualification to relate warnings to risks posed by air bags
¶ 89. The court accepted Dorris as an expert in human factors and warnings. At Dorris' voir dire, the Palmers attempted to establish that, like the Palmers' warning expert Wogalter, Dorris should not be allowed to relate air bag warnings to the danger posed by air bags. See Issue VI. A. The Palmers questioned Dorris regarding *591 his knowledge of air bag engineering. Dorris stated that he had never been involved in the manufacture or design of air bags. Dorris admitted that he had no familiarity with manufacture or design of air bags "beyond what an ordinary person would have."
¶ 90. The Palmers argue that Dorris should not have been allowed to testify as to the effectiveness of air bag warnings based on the court's earlier exclusion of this testimony by Wogalter. It is true that "[w]here evidence of a particular matter offered by one party has been excluded, although perhaps improperly, on the objection of the adverse party, the adverse party is not entitled to introduce evidence with respect to the same matter." Fountain v. Reid, 214 Miss. 269, 58 So.2d 666, 670 (1952). We find that the trial court properly allowed this testimony from Dorris because its earlier ruling on Wogalter was incorrect. Both experts should have been allowed to relate their knowledge of warnings to the problem of air bags, because, as Wogalter testified, it is the generally accepted methodology for human factors experts to apply their knowledge of human behavior to different types of problems. M.R.E. 702. Of course, on retrial the court will have to assess the competency of both experts' testimony under the current Rule 702, which adopted the Daubert standard for admission of expert testimony. See M.R.E. 702 cmt. (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (effective May 29, 2003)).

2. Dorris' testimony on NHTSA's rule making history
¶ 91. Dorris testified regarding the NHTSA's promulgation of Federal Motor Vehicle Safety Standard 208 (FMVSS 208). The Palmers complain that this testimony introduced inadmissible hearsay. Specifically, the Palmers argue that Dorris was allowed to introduce the history of the standard, and hearsay statements from consumer interest groups and automobile manufacturers regarding the adequacy of the sun visor warning labels. For example, Dorris testified that the Advocates for Highway and Auto Safety feared that other air bag warnings would be counterproductive. He testified that the Coalition for Consumer Health and Safety did not want to inadvertently alarm motor vehicle occupants. He testified that consumer interest groups did not want unnecessarily alarming statements that would frighten people. The Palmers further argue that Dorris' testimony regarding NHTSA's concerns, views, rationale and "thought process" on FMVSS 208 and air bag warnings was outside the scope of expert testimony.
¶ 92. Volkswagen argues that the testimony was admissible because Dorris was an expert on the history of the promulgation of FMVSS 208. At trial, Dorris testified that he and his son had recently reviewed every submission made to the NHTSA regarding air bag warnings for the past six to eight years, and the Society of Automotive Engineers published a peer review article summarizing their findings. Volkswagen argues that under Paccar v. NHTSA, 573 F.2d 632, 636 (9th Cir.1978), an expert on promulgation of a safety standard may testify to the input the agency received that informed its development of the safety standard.
¶ 93. Volkswagen's reliance on Paccar is misplaced. Unlike Paccar, the instant case did not involve a challenge to a federal safety standard, nor was evidentiary procedure dominated by procedures for such a challenge mandated by the United States Code. See id. In this case, the safety standard was relevant to whether or not Volkswagen's warnings complied with the standard. Dorris' testimony on the *592 history of the standard was offered by Volkswagen to show that different warnings in the Jetta would have been disapproved of by some consumer groups whose opinions were considered by NHTSA in promulgating FMVSS 208. This was to rebut the Palmers' evidence that Volkswagen should have altered the warning labels.
¶ 94. The Palmers' argument is that the Mississippi Rules of Evidence restrict an expert from quoting into evidence otherwise inadmissible facts or data that the expert relied upon in forming opinions. Mississippi Rule of Evidence 703, "Bases of Opinion Testimony by Experts," and Rule 705, "Disclosure of Underlying Facts of Data," are applicable. Rule 703 states that an expert may rely on facts or data not admissible in evidence if the facts or data is of the type reasonably relied upon by experts in the field. Rule 705 states that "[t]he expert may testify in terms of opinion or inferences and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."
¶ 95. Our supreme court recently reviewed the precedent on this issue in Flowers v. State, 842 So.2d 531, 559-60 (¶¶ 85-88) (Miss.2003). In Slay v. Illinois Central Gulf Railroad Co., 511 So.2d 875, 879 (Miss.1987), the court found the trial court correctly allowed an expert to testify about statements made to him in forming his opinion where the statements were not offered to prove the truth of the matter asserted. The expert's testimony about the statements would have otherwise been inadmissible hearsay. Id. In Morley v. Jackson Redevelopment Authority, 632 So.2d 1284, 1294 (Miss.1994), the court refined this distinction by stating that an expert could not testify to inadmissible hearsay statements when the statements were used to merely bolster his opinion. The court stated, "while a witness may rely on information which is inadmissible in evidence, that does not give the witness the right to circumvent the rules of hearsay by giving statements which corroborate his view." Id.
¶ 96. This precedent indicates that Dorris' statements were admissible. Dorris was qualified as an expert in human factors and warnings, with special expertise in the NHTSA's promulgation of FMVSS 208 by virtue of his peer review paper on the subject. All of the challenged statements went to show why and how Dorris reached his opinion on the history of the NHTSA's promulgation of FMVSS 208, and were not offered for their truth. Dorris' quotes of consumer groups went to explaining how he reached his opinion on why the NHTSA selected certain criteria for FMVSS 208 and rejected others. Dorris' statements on the NHTSA's "thought process" constituted Dorris' expert opinion on why the NHTSA made certain decisions. The trial court was within its discretion in admitting Dorris' statements.

3. Dorris' testimony about the public's perception of the dangers of air bags
¶ 97. The trial court allowed Dorris to state his opinion on the level of public awareness of the dangers of air bags. Dorris based the opinion on his review of information including several studies, surveys and a summary of media coverage. The information included statistics on public awareness. The court found that statistical information on public awareness outside of Mississippi was not relevant, and, therefore, limited Dorris' testimony about the studies and surveys to general statements. Dorris' sole testimony regarding the studies and surveys was: "[t]here was a lot of media coverage of various types of media, national, local, print, electronic, *593 television, whatever, very extensive coverage of these issues, and there is literature or studies that indicate that people were getting the message."
¶ 98. The Palmers argue that this testimony was unreliable because no background data on the studies was available. This argument is without merit; Dorris' testimony satisfied the trial court that the studies were of the type considered reliable for forming expert opinions. M.R.E. 703.
¶ 99. The Palmers further argue that the testimony was irrelevant because the studies or surveys did not show that they reflected Mississippians' awareness. This argument is also without merit. The trial court ruled that only the specific statistical information was irrelevant because it did not reflect Mississippians' awareness. The court found that the general information from the studies was relevant even though it did not reflect Mississippians' awareness, so Dorris' testimony was within the trial court's ruling.
¶ 100. The Palmers also argue the testimony was not relevant because Volkswagen did not plead the defense that the dangers of air bags are "open and obvious." Volkswagen was entitled to introduce evidence on whether the danger of air bags was open and obvious under Mississippi Code Annotated section 11-1-63(e) to rebut the Palmers' inadequate warnings claim. In Hageney v. Jackson Furniture of Danville, 746 So.2d 912, 925-26 (¶¶ 51-56) (Miss.Ct.App.1999), the Court examined a jury instruction listing the elements of an inadequate warnings claim but failing to state that open and obviousness is a factor to be considered by the jury in determining whether the air bag was unreasonably dangerous. The Court found that Mississippi Code Annotated section 11-1-63(e) requires an inadequate warnings instruction to so state. Id. at (¶ 56). In the case sub judice, the court gave the instruction required by section 11-1-63(e). The trial court properly allowed Volkswagen to present evidence that the danger was open and obvious. This issue is without merit.

VIII. WHETHER THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF SEAT BELT USE, NON-USE, AND/OR WARNINGS.
¶ 101. The plaintiffs filed a motion in limine requesting that the trial court exclude all evidence of seat belt use and non-use, and seat belt warnings based on Mississippi Code Annotated section 63-2-3. The trial court granted the motion insofar as it requested exclusion of references to any law requiring use of seat belts, but otherwise denied the motion. On appeal, the Palmers argue that evidence of seat belt use or non-use should not have been admitted regarding Jennifer Palmer, Anne Palmer, and the Palmer family, and that evidence of the Jetta's seat belt and air bag warnings was inadmissible.
¶ 102. Mississippi Code Annotated section 63-2-3 provides:
This chapter shall not be construed to create a duty, standard of care, right or liability between the operator and passenger of any passenger motor vehicle which is not recognized under the laws of the State of Mississippi as such laws exist on the date of passages of this chapter or as such laws may at any time thereafter be constituted by statutes or court decision. Failure to provide and use a seat belt restraint device or system shall not be considered contributory or comparative negligence, nor shall the violation be entered on the driving record of any individual.

Id. (emphasis added). In Hunter v. General Motors, 729 So.2d 1264 (Miss.1999) the court held that section 63-2-3 does not *594 constitute an improper statutory rule of evidence. This is because the statute does not bar admission of evidence, but instead prevents consideration of seat belt non-usage as contributory or comparative negligence. The court stated that the statute does have significant implications for admission of seat belt evidence. Therefore, our review of the trial court's decision on whether admission of the evidence conflicts with section 63-2-3 is de novo.
¶ 103. The instant case involves the crashworthiness of the 1995 Jetta. In a crashworthiness case, the plaintiff does not argue that the defendant car manufacturer negligently caused the accident. Rather, the plaintiff argues that the manufacturer contributed to the severity of the injuries suffered. Quay v. Archie L. Crawford and Shippers, 788 So.2d 76, 90 (¶ 65) (Miss.Ct.App.2001).
¶ 104. Hunter discussed how section 63-2-3 applies in a crashworthiness case. The court began by noting that section 63-2-3 does not bar admission of evidence of seat belt non-use outright. The statute only bars considering seat belt non-use as contributory or comparative negligence. The court concluded that "evidence of seat belt non-usage may constitute relevant evidence in some (but by no means all or even most) cases, so long as (1) the evidence has some probative value other than as evidence of negligence; (2) this probative value is not substantially outweighed by its prejudicial effect and is not barred by some other rule of evidence and (3) appropriate limiting instructions are given to the jury, barring the consideration of seat belt non-usage as evidence of negligence." Hunter, 729 So.2d at 1268 (¶ 11). Further, section 63-2-3 does not bar consideration of relevant evidence of seat belt use, as opposed to non-use, because a jury could not conclude that use of a seat belt constitutes negligence. Herring v. Poirrier, 797 So.2d 797, 805-06 (¶¶ 24-25) (Miss.2000).
¶ 105. Hunter involved a car accident. The plaintiffs sued General Motors, alleging that the car's front passenger seat backs were not strong enough to withstand unrestrained rear passengers striking the seat backs during the accident. The plaintiffs offered evidence that the rear passengers had not worn seat belts. The trial court admitted the evidence. On review, the supreme court held that the evidence of seat belt non-use was admissible evidence of the crashworthiness of the GM car. The court stated that the evidence was probative to show the jury how the plaintiff's injuries occurred, and was not unduly prejudicial, especially since the plaintiffs first introduced it. However, the court reversed for a new trial because the jury was never instructed not to consider seat belt non-usage as evidence of negligence.

A. Jennifer Palmer's seat belt non-use
¶ 106. The Palmers' design defect claim focused on the safety of the Jetta's air bag design. The parties argued whether the air bag had been designed for use with seat belts. The Palmers argued that the Jetta's air bag was intended as a passive restraint that would be effective without seat belts. Volkswagen argued that the air bag was designed as a supplemental restraint and, therefore, would be unsafe if used without seat belts. These arguments presented a fact question for the jury.
¶ 107. We find that the evidence of Jennifer Palmer's seat belt non-use was relevant under Hunter. The jury would have had to hear Volkswagen's argument about seat belts in order for Volkswagen to effectively defend its restraint system design. Also, for the jury to understand the accident it would have had to know that Jennifer was unbelted. While the *595 evidence certainly was prejudicial to the Palmers' case, the fact of Jennifer's failure to wear a seat belt during the accident had significant probative value because, if the jury accepted the argument that the air bag was a supplemental restraint, it went to the crux of whether Jennifer used the air bag as it was designed. And, the jury was instructed that Jennifer's failure to use her seat belt could not be considered evidence of negligence.

B. Anne Palmer's seat belt non-use
¶ 108. At trial, Volkswagen presented evidence that Anne Palmer was not wearing her seat belt on the day of the accident. There was no claim that Anne's air bag was defectively designed, so this evidence was irrelevant except as evidence of Anne's negligent failure to follow seat belt warnings. Evidence of seat belt non-use to show negligence is prohibited by Mississippi Code Annotated section 63-2-3. There was no allegation that Anne Palmer was negligent, and evidence of Anne's negligent failure to wear her seat belt was not probative of any issue in the case. The evidence served no function other than to prejudice the Palmers by parading Anne's wrongdoing before the jury. The court failed to instruct the jury Anne's non-use of her seat belt could not be considered negligence, leaving the jury free to reach that conclusion. Admission of this evidence was error under Hunter and section 63-2-3.

C. The Palmer family's seat belt non-use
¶ 109. Volkswagen's expert, Robert Gratzinger, presented photographs of the driver and passenger-side seat belt latches and opined that the latches did not have enough scratches to indicate consistent use. Volkswagen argues this was relevant to show that the Palmers did not follow warnings. This was a negligence argument. It sought to show that the Palmers were negligent in their approach to warnings. Therefore, this issue implicates Mississippi Code Annotated section 63-2-3 and the considerations enumerated in Hunter.
¶ 110. We find that admission of the photographs and Gratzinger's opinion was error. The sole probative value of the evidence was that it showed the Palmers' negligent treatment of warnings. Hunter, 729 So.2d at (¶ 11). Volkswagen showed that the Palmers had not read the sun visors or the owner's manual. Thus, Volkswagen presented the Palmers' tendency to ignore warnings to the jury without reference to the Palmers' failure to wear seat belts. The evidence of the photographs and expert opinion was highly prejudicial to the Palmers because it emphasized the Palmers' negligent failure to use seat belts. Id. Again, the court did not instruct the jury that any evidence of the Palmer family's seat belt non-use could not be considered negligence. Id.

D. Evidence of the Jetta's seat belt warnings
¶ 111. The Palmers argue that the trial court erred by allowing Volkswagen to emphasize "every chime, light, and statement" related to seat belt use. They argue that Alan Dorris' testimony about each seat belt reminder provided by the Jetta and the owner's manual was unfairly prejudicial.
¶ 112. This argument is without merit. The Palmers argued that the Jetta's warnings inadequately informed them about safe use of the air bag. To rebut this argument, Volkswagen introduced the substance of the warnings to show that it adequately warned the Palmers about seat belts, which it insisted were integral to safe use of its air bag restraint system.

*596 IX. WHETHER THE TRIAL COURT ERRED IN ALLOWING DEFENDANTS TO INTRODUCE NASS DATA REGARDING ACCIDENTS NOT SIMILAR TO THE SUBJECT ACCIDENT AND IN ALLOWING DEFENDANT'S EXPERTS TO GIVE OPINIONS BASED ON NASS DATA.
¶ 113. The trial court allowed Volkswagen's experts, Verne Roberts and Robert Gratzinger, to testify about accident data from the National Accident Sampling System (NASS) database. The NASS database consists of accident information that the NHTSA selects for in-depth investigation of causal factors. The NASS data relied upon by Volkswagen's experts included a statistical sampling of accidents below 21 m.p.h. Delta V, involving different types of cars and adult and child passengers. The data spanned from 1980 to 1999.

A. Testimony of Verne Roberts
¶ 114. Verne Roberts, a biomechanical consultant, relied on the NASS data and the litigation test videos to form the opinion that Jennifer's injuries would have been minimal had she been properly belted. The Palmers argue that the NASS data was not the type reasonably relied upon by biomechanical experts, and could not support expert opinions in the area of biomechanics. The Palmers also argue that Roberts was not qualified to give any biomechanical opinions in the case because he knew little about the subject accident, and that this resulted in extreme prejudice to their case.
¶ 115. The trial court's admission of Roberts' testimony was within its discretion. Roberts was qualified as an expert in the area of biomechanics and particularly occupant kinematics, the study of how a human body moves in a car crash. He testified that NASS data is of the type reasonably relied upon by experts in his field. Several experts, including the Palmers' expert, Taras Rudnitsky, testified that NASS data is reasonably relied upon by those in the air bag design field. The U.S. Supreme Court cited NASS data in its discussion of the promulgation of FMVSS 208. Geier v. American Honda Motor Co., 529 U.S. 861, 878, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). There were sufficient grounds for the trial court to conclude that the NASS data was a proper basis for Roberts' expert testimony under Rule 703.
¶ 116. Roberts stated that his job requires analysis of statistical data in order to reach conclusions. He testified to his conclusions from the NASS data. Roberts did not need to know the specifics of the subject accident to form an opinion that he admitted was based solely on the NASS data and on the litigation test videos. The Palmers had an opportunity to cross-examine Roberts regarding his conclusions and lack of knowledge of the subject accident.

B. Testimony of Robert Gratzinger
¶ 117. Robert Gratzinger was designated as an expert in automotive restraint system design. Gratzinger used the NASS data to graph the severity of injury in frontal crashes at various Delta V's. Based on these graphs, Gratzinger opined that there would be increased danger to occupants by employing the higher air bag deployment threshold that was suggested by the Palmers. The Palmers argue that this expert opinion should have been excluded because, on cross-examination, Gratzinger admitted that the graphs were general, not specific to the Jetta, and that Volkswagen did not rely on the NASS data in setting its deployment threshold.
¶ 118. These graphs were admissible. Again, the expert testified that NASS data is reasonably relied upon by experts in his field. M.R.E. 703. The graphs were offered to rebut the Palmers' proof of reasonable *597 alternative design, an element of their design defect claim. The graphs pertained to passenger cars including the Jetta, and rebutted the opinions of the Palmers' expert Taras Rudnitsky that most passenger cars have defectively low air bag deployment thresholds, and that higher deployment thresholds would cure the problem.

X. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE "EFFECTIVENESS" OF AIR BAGS.
¶ 119. The Palmers complain of several rulings that allowed the jury to hear evidence that air bags are effective and save lives. The Palmers argue that their case did not attack the entire air bag industry, but only the safety of the air bag in the 1995 Jetta for children. Therefore, they argue, Volkswagen should not have been allowed to introduce evidence of effectiveness or safety of other vehicle's air bags. The Palmers argument indicates that they are complaining that information on general air bag effectiveness and safety was not relevant.
¶ 120. The first incident of evidence of lives saved by air bags cited by the Palmers is a question by Volkswagen's attorney to Randal Palmer. The attorney asked, "In addition to the other things you've learned [about air bags since the accident], have you learned that the federal government says that 6,377 lives have been saved?" Randal Palmer did not answer. The court sustained the Palmers' objection to the question and instructed the jury to disregard the question. In order for this Court to reverse a judgment based on an improper argument claim, we must first find an "abuse, unjustified denunciation or a statement of fact not shown in the evidence" and, second, find that it was probable that the improper statement had a harmful influence on the jury. Woods v. Burns, 797 So.2d 331, 334 (¶ 10) (Miss.Ct.App.2001). In this case the court sustained the objection and properly instructed the jury, and it was improbable that the jury was improperly influenced by the comment. There was no error.
¶ 121. The second incident of evidence lives saved by air bags was the court's admission of the NASS data charts prepared by Verne Roberts. The charts showed less injury to occupants when an air bag is present than without an air bag. The charts also showed less injury to occupants when seat belts and air bags are used together. We have already found that the NASS data was admissible. Any tendency of the admissible NASS data to show that air bags are generally safe was permissible because the relevancy ruling was within the court's discretion. M.R.E. 401.
¶ 122. The Palmers' brief states that Gratzinger testified that air bags were 75% effective. The record shows that Gratzinger testified that they were 50-60% effective; Gratzinger was relying on the NHTSA's reports to Congress regarding air bags. The Palmers do not challenge the underlying NHTSA reports, only that the trial court should have limited the expert's ability to voice conclusions about the effectiveness of air bags. The "effectiveness" of air bags was relevant to the jury's ability to conduct the risk-utility analysis to determine whether the Jetta's air bag was defectively designed. Sperry-New Holland v. Prestage, 617 So.2d 248, 254 (Miss.1993). The trial court correctly allowed this testimony.

XI. WHETHER THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF OTHER SIMILAR VOLKSWAGEN ACCIDENTS WHICH HAVE CAUSED FATALITIES TO BOTH BELTED AND UNBELTED OCCUPANTS.
¶ 123. The Palmers offered two cases involving prior accidents to show *598 that Volkswagen air bags caused other fatalities to belted and unbelted occupants. The Palmers argue that these cases would have shown Volkswagen had notice of a problem and that the 1995 Jetta's air bag design was defective. The Palmers also attempted to cross-examine Volkswagen's experts using the cases. The trial court excluded these cases after finding that the cases were not substantially similar to the subject accident.
¶ 124. Prior accidents may be admissible to show the existence of a dangerous condition or the defendant's notice thereof. Yoste v. Wal-Mart Stores, Inc., 822 So.2d 935, 936 (¶ 8) (Miss.2002). But, evidence of prior accidents is not admissible unless substantially similar to the subject accident. Id. In this case, the trial court found that the two accidents offered by the Palmers were not substantially similar to the subject accident. The transcript reveals that the Palmers' counsel provided the trial court with the following facts regarding the two cases. In the first case, Sieb v. Volkswagen, a properly belted adult female passenger of small stature was killed in a Jetta with the same front passenger air bag system as the subject Jetta. This female's seat position was three inches farther back than Jennifer's. The Delta V was around 24, higher than the estimates of the plaintiffs and defense in the instant case. In the second case, Greer v. Volkswagen, a young child in an unbelted forward facing child seat in the front passenger seat was decapitated by the air bag. Thus, there were significant aspects of both cases that were different from the subject accident. The trial court was within its discretion in finding that the prior accidents offered by the Palmers were not substantially similar to the subject accident.

XII. WHETHER THE TRIAL COURT ERRED IN EXCLUDING OTHER SCI REPORTS AND EVIDENCE OF PROPERLY BELTED OCCUPANTS INJURED BY AIR BAGS.
¶ 125. Volkswagen's expert, Verne Roberts, testified that the NASS data showed that there were no air bag fatalities to properly belted children ages 4-11. The Palmers sought to cross-examine Roberts with summaries and charts derived from Special Crash Investigation reports on other similar accidents. The SCI reports were compiled by the NHTSA, and consisted of detailed information on approximately two hundred air bag accidents. The trial court disallowed this cross-examination because the SCI summaries had been excluded from evidence. The Palmers proffered that they would have asked Roberts if he was aware of the SCI reports, and if he knew that the reports showed that some children had been killed by the passenger side air bag despite being properly restrained.
¶ 126. The trial court erred by disallowing the cross-examination. On cross-examination of an expert witness, a party is entitled to delve into the facts, data or opinions reasonably relied upon by the expert under Rule 703. M.R.E. 703. Rule 703 states that the basis of an expert's opinion need not be admissible in evidence. Thus, a party may ask an expert on cross-examination whether the expert has considered a certain source reasonably relied upon by experts in the field. Shaffer v. State, 740 So.2d 273, 281 (¶ 27) (Miss.1998). In this case, the trial court did not consider whether the SCI reports were reasonably relied upon by experts in Roberts' field. The SCI reports were compiled by the NHTSA, the same government agency responsible for the NASS database upon which Roberts relied. The trial court abused its discretion by barring the cross-examination *599 on the ground that the SCI reports were not admitted into evidence.
¶ 127. The error prejudiced the Palmers. Roberts' testimony from the government's NASS database indicated that belted occupants were usually unharmed by the air bag. The SCI reports, also compiled by the government, supported the Palmers' claim that belted occupants also receive serious or fatal injuries, and the Palmers were not allowed to ask Roberts if he was aware of them.

XIII. WHETHER THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF AIR BAG DEPOWERING.
¶ 128. Volkswagen's expert, Robert Gratzinger, testified that depowered air bags "don't make the out of position occupant injuries substantially different," and that depowering could result in increased injuries to adults. The Palmers complain that the court did not allow them to cross-examine Gratzinger with a 1997 proposed rule promulgated by NHTSA and published in the Federal Register. The proposal recognized the special risk air bags pose to children, stated that depowering air bags by 10-35% could reduce injury for persons close to the air bag without losing benefits provided by air bags, and opined that, "it is possible that some of today's air bags are so aggressive that they could, if optimized, be depowered by more than 35% without substantial losses in adult benefits."
¶ 129. The Palmers have failed to preserve this assignment of error for appeal. During an unrecorded bench conference, the trial court permitted the Palmers to use certain portions of the proposal on cross-examination. On cross, the Palmers began questioning Gratzinger using portions of the proposal beyond the court's bench conference ruling. Volkswagen objected, and the court sustained the objection, presumably because the cross-examination strayed beyond the court's admissibility ruling. It is unclear from the transcript why these portions were excluded by the trial court. The Palmers could have presented this issue to this Court by describing the trial court's ruling pursuant to Mississippi Rule of Appellate Procedure 10(c); without more we are unable to determine whether or not the trial court properly exercised its discretion. See Edwards v. State, 723 So.2d 1221, 1227-28 (¶ 25) (Miss.Ct.App.1998).

XIV. WHETHER THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT ON PLAINTIFFS' CLAIMS OF NEGLIGENT DESIGN OF THE AIR BAG AND NEGLIGENT FAILURE TO WARN.
¶ 130. At the close of evidence, the trial court granted Volkswagen's motion for a directed verdict on the Palmers' claims of negligent design and negligent failure to warn. The court granted the motion after concluding that the negligence claims were redundant because the court was instructing the jury on the Palmers' claims of defective design and failure to warn under the MPLA. On appeal, the Palmers argue that, because they presented "overwhelming evidence" of Volkswagen's negligence, the trial court erroneously directed a verdict on the negligence claims.
¶ 131. The trial court's grant of a directed verdict is subject to de novo review. Anderson v. B.H. Acquisition, Inc., 771 So.2d 914, 917 (¶ 5) (Miss.2000). "When a party moves for a directed verdict, the trial court must look, `solely to the testimony on behalf of the opposing party; if such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury.'" Id. (quoting Biloxi Reg'l Med. Ctr. v. David, 555 So.2d 53, 57 (Miss.1989)). We will *600 affirm the trial court's grant of a directed verdict only when the plaintiff's evidence is so lacking that reasonable jurors would be unable to reach a verdict in favor of the plaintiff. Anderson, 771 So.2d at 917. This standard of review "is predicated on the fact that the trial court applied the correct legal standard." Sperry-New Holland v. Prestage, 617 So.2d 248, 252 (Miss.1993). This standard of review for the trial court's grant of a directed verdict is the same for reviewing the trial court's grant of a peremptory instruction. Id.
¶ 132. We find that the trial court applied the correct legal standard in directing verdicts on both the Palmers' negligence claims. In Hunter v. General Motors, 729 So.2d 1264, 1277-78 (¶ 48) (Miss.1999), our supreme court held that when a plaintiff claims defective design under the MPLA, a jury instruction on negligence is not necessary. But see Childs v. General Motors, 73 F.Supp.2d 669, 673 (N.D.Miss.1999). The court stated that Mississippi applies the risk-utility test for determining whether a product has a design defect. Hunter, 729 So.2d at (¶ 48). The court adopted the holding of Prentis v. Yale Manufacturing Co., 421 Mich. 670, 365 N.W.2d 176 (1984). Hunter, 729 So.2d at (¶ 48). Prentis found that, because the risk-utility test requires the jury to reach a conclusion about the manufacturer's conduct, the test is a version of Judge Learned Hand's negligence calculus. Id. (citing Prentis, 421 Mich. at 687, 365 N.W.2d at 184). Therefore, the Prentis court reasoned, a jury performing risk-utility analysis necessarily makes a negligence determination. Id. "[T]he jury need only be instructed on a single unified theory of negligent design." Id. (quoting Prentis, 421 Mich. at 695, 365 N.W.2d at 187). In the case sub judice, the jury was properly instructed on the Palmers' claim of design defect under the MPLA, and additional negligence instructions would have been redundant.
¶ 133. We find that the Hunter reasoning extends to the Palmers' claim of negligent failure to warn. Mississippi Code Annotated section 11-1-63(c)(i) (Rev.2002) provides,
In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)(2) of this section, if the claimant does not prove by a preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize the dangerous condition.
(emphasis added). Thus, like a claim of design defect, a claim of inadequate warnings under the MPLA requires the jury to perform negligence analysis in assessing liability. O'Flynn v. Owens-Corning, 759 So.2d 526, 534 (¶ 20) (Miss.Ct.App.2000); see Phillip L. McIntosh, Tort Reform in Mississippi: An Appraisal of the New Law of Products Liability, Part II, 17 Miss. C.L.Rev. 277, 304 (1997). Where, as here, the jury is instructed pursuant to the MPLA, the court need not present the jury with a separate negligence instruction on inadequate warnings.

XV. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT JURY INSTRUCTION P-23 REGARDING VOLKSWAGEN'S POST SALE DUTY TO WARN.
¶ 134. The Palmers submitted jury instruction P-23 charging the jury that Volkswagen had a post-sale duty to *601 warn the Palmers of the dangers of air bags because Volkswagen knew or should have known that air bags were killing children. The trial court denied the instruction as an improper statement of law or fact.
¶ 135. The Palmers claim that Mississippi recognizes or should recognize a post-sale duty to warn and cite the Restatement (Third) of Torts: Products Liability, section 10(a) (1997), which states:
One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to provide a warning after the time of sale or distribution of a product when a reasonable person in the seller's position would provide such a warning.
In contrast, the MPLA states:
The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller ... [t]he product was defective because it failed to contain adequate warnings or instructions.

Miss.Code Ann. § 11-1-63(a)(i)(1) and (2) (Rev.2002) (emphasis added). The plain meaning of the MPLA's language is that the statute imposes liability on the manufacturer or seller for warnings that were inadequate at the time of sale, not for warnings that became inadequate at some later time. Therefore, it appears that there is no post-sale duty to warn under the statute. See Phillip L. McIntosh, Tort Reform in Mississippi: An Appraisal of the New Law of Products Liability, Part II, 17 Miss. C.L.Rev. 277, 307 (1997). The courts of Mississippi have not addressed the issue of post-sale duty to warn. The supreme court had the opportunity to do so prior to the enactment of the MPLA in Brown v. Williams, 504 So.2d 1188, 1192 (Miss.1987), but resolved that case on other grounds. This Court is not prepared to recognize a post-sale warning duty at this time and in the absence of legislative action. "The trial court can and should refuse to instruct the jury when the instruction is an incorrect statement of the applicable law." Hageney v. Jackson Furniture of Danville, 746 So.2d 912, 926 (¶ 56) (Miss.Ct.App.1999) (citing Bunch v. Shaw, 355 So.2d 1383, 1385 (Miss.1978)). The trial court properly refused the instruction.

XVI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT JURY INSTRUCTION P-24 REGARDING DEFENDANT'S FAILURE TO EXERCISE REASONABLE CARE IN POST-SALE WARNING.
¶ 136. Trial testimony established that the NHTSA promulgated new air bag warning labels for installation in new cars, and strongly urged vehicle manufacturers to send the new labels to drivers of air bag-equipped vehicles already on the road. In February 1997, Volkswagen sent the new warning labels via first class mail to all registered owners and lessees of Volkswagen vehicles with air bags. The Palmers asserted that they never received the labels. They argued that, by conducting the mailing, Volkswagen voluntarily assumed a post-sale warning duty and breached the duty by failing to exercise reasonable care to assure the Palmers received the labels. Based on this theory, the Palmers proffered jury instruction P-24, which provided:
The Court instructs the jury that if you find that Defendants voluntarily assumed a post sale duty to warn and you further find that Defendants failed to exercise reasonable care in discharging that duty, then you shall return a verdict for Plaintiffs.
*602 The trial court refused the instruction after finding it unsupported by the evidence or the law. On appeal, the Palmers contend that this ruling was error because Mississippi common law recognizes that a party undertaking an action for the benefit of another person assumes a duty to perform the action with reasonable care.
¶ 137. We explore the question of what duty, if any, arises from the performance of a gratuitous act in Mississippi. In Higgins Lumber Co. v. Rosamond, 217 Miss. 1, 9, 63 So.2d 408, 411 (1953), the court held that an agent could be held to a duty of reasonable care for a gratuitous, non-contractual, undertaking if the plaintiff relied upon the agent's performance of the undertaking. The court based this holding in significant part upon the tort principle that a party may voluntarily assume a duty of care by undertaking to provide a benefit to another party, upon which undertaking the other party detrimentally relies. Id.
¶ 138. Applying Higgins, the Fifth Circuit found that Mississippi common law imposes a duty of care for a voluntary undertaking only if the plaintiff has detrimentally relied upon the defendant's undertaking. Coleman v. Louisville Pants Co., 691 F.2d 762, 766 (5th Cir.1982). In Coleman, a group of employees sued their former employer, alleging the employer breached a duty of care that resulted in deprivation of the employees' benefits under the Trade Act of 1974. Id. at 763. In an attempt to secure the plaintiffs' benefits, the employer had mailed a petition to their union, which was to file the petition with the Secretary of Labor. Id. at 764. The union never received the petition, and the plaintiffs lost their benefits. Id. They argued that the employer breached a voluntarily assumed duty to file the claim on the plaintiffs' behalf. Id. at 766. The court held that the plaintiffs had not stated a common law negligence claim because they failed to produce any evidence that they relied upon, or even knew about, the employer's gratuitous undertaking. Id.
¶ 139. More recently, our supreme court addressed this issue in Century 21 Deep South Properties v. Corson, 612 So.2d 359, 368, 367-69 (Miss.1992). In that case, a real estate agency gratuitously promised a non-client that it would provide him with title work. Id. at 368. The non-client expected the agency to perform and did not hire anyone else to supply the title work. Id. The agency was held to have undertaken a limited duty of care to provide the non-client with the title work because the agency promised the non-client that it would provide the work, and the non-client relied upon the promise. Id.
¶ 140. This precedent demonstrates that a party may be held liable for negligent performance of a voluntary act only if the plaintiff has detrimentally relied upon the performance. In the case sub judice, the proffered jury instruction failed to articulate the reliance element of voluntary assumption of a duty. Further, the Palmers presented no evidence that they relied upon any promise of Volkswagen to furnish them with updated air bag warnings after the lease of the 1995 Jetta. There was no evidence that Volkswagen assumed a common law post-sale duty to warn the Palmers, and the trial court correctly refused the jury instruction.

XVII. WHETHER THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL.
¶ 141. We recognize that no party is entitled to a perfect trial and that no trial is free of mistake. We acknowledge the difficult task required of our trial judges to rapidly and correctly render evidentiary rulings. In this instance, the lower court committed several errors that were likely sufficient to warrant reversal had they stood alone. These errors involved the *603 owner's manual, the litigation testing videos, the testimony of Dr. Michael Wogalter, and the seat belt evidence. Other errors, such as those involving the NTSB letter, Miller's impermissible expert testimony, and the SCI reports, harmed the Palmers, but perhaps too insubstantially to constitute reversible error had they stood alone. We need not resolve this question today. The accumulated errors in this trial extended beyond mere imperfection and resulted in substantial harm to the Palmers, for which they are entitled to a new trial. See Estate of Hunter v. General Motors, 729 So.2d 1264, 1279 (¶ 55) (Miss.1999).
¶ 142. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, P.J., BRIDGES, LEE AND MYERS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., THOMAS AND GRIFFIS, JJ.
SOUTHWICK, P.J., dissenting.
¶ 143. This was a contentious nine day trial, with twenty-one witnesses, fifty exhibits, and well over a hundred objections by plaintiff. The majority reverses because of seven erroneous evidentiary rulings. I find only two. Regardless, this appellate court's post-trial, reflective advantage will inevitably cause us to find in a trial of this length rulings with which we disagree. In a new trial there would be other perceived errors. A perfect trial is not even a sensible goal. Required is a fair trial. The majority acknowledges that imperative, but respectfully, I do not believe they follow it. Insofar as rulings on evidence are concerned, fairness depends on each side's having an opportunity to present its case with reasonable completeness and without unreasonable prejudice from the admission of an adversary's evidence. This trial met that standard. We should affirm.

1. Redaction of picture from owner's manual exhibit
¶ 144. An owner's manual for this vehicle was offered in evidence. Volkswagen was successful in having a picture of a child in car seat redacted from the exhibit. The majority finds significant error on two bases: the picture was relevant, and there is a rule of completeness for evidence of writings. I will examine both conclusions.
¶ 145. Liability was alleged due to the failure of adequate warnings as well as defective design. As to warnings, federal regulations required a warning on the sun visor; a manufacturer was also required to include particular information in the owner's manual. See Federal Motor Vehicle Safety Standard 208. There were dueling warnings experts but no testimony that Volkswagen had failed to comply with these regulations. Therefore, this is not a case about the failure of a manufacturer to meet a regulatory standard. Instead, the argument is that despite such compliance, some acts by the manufacturer diluted the mandated warnings while subsequent warnings also were needed.[5]
¶ 146. The majority concludes that the picture of an infant in a car seat in the *604 front of the vehicle may have misled the Palmers into believing the air bag was safe for their daughter, who was much older than the pictured child. The picture appears in a section regarding seat belts and child restraints, not in the separate section which contained the required air bag warnings.
¶ 147. In its motion in limine to exclude the page with the picture, Volkswagen conceded that the picture was inaccurate, but this suit was not about infant seats. The trial court agreed, finding that the picture had nothing to do with air bags and excluded it as irrelevant and unduly prejudicial, in part because it would confuse the issues that were properly for the jury's consideration.
¶ 148. There is legitimate argument to be made respecting the validity of the trial judge's conclusion as to relevance. Volkswagen fully complied with the federal regulatory requirements for warnings about air bags. Does the picture, which does not concern air bags nor a child who is too big for a car seat, somehow create an issue of misdirected warning? I find that the trial judge's analysis was reasonable and not the basis for reversal. Yet regardless, the family admitted that they never looked at the manual. Once that is admitted, surely there is no fact issue that had the challenged picture not been in the manual, the family would have read the manual. So the point of decision for us is whether a case can be based on a misleading warning that the plaintiffs never saw.
¶ 149. The majority addresses that point by saying that reliance on warnings is not part of a product liability case based on inadequate warnings. The concept of reliance misdirects us, as it would ask whether the Palmers relied on what they did not read. The issue instead is whether a proximate cause of injury was a defect in the warning. The statute that the majority cites as to reliance shows that one of the elements of a product liability suit is that the defective conditionhere, an allegedly inadequate warning"proximately caused the damages for which recovery is sought." Miss.Code Ann. § 11-1-63(a)(iii) (Rev.2002). The precedent that the majority also cites could have been more clearly written. Still, I find that it also discusses the need for proof of a causative connection between the alleged inadequacies of the warnings and the injury. Wolf v. Stanley Works, 757 So.2d 316, 322-23 (Miss.Ct.App.2000). Nothing in the opinion holds that a plaintiff may recover for inadequate warnings without showing the inadequacies were the proximate cause of injury.
¶ 150. The majority responds to these issues by referring to the plaintiffs' argument that had the warnings on the visorwhich complied with very specific federal regulatory requirements on language and locationbeen larger, better worded, and in a more noticeable presentation, the visor would have caused them to look in the owner's manual and see the allegedly misleading picture. With respect, what might have happened in other circumstances has nothing to do with whether this picture in this manual contributed to this accident. It is admitted that the plaintiffs never saw this picture. Therefore, they could not have been misled and the picture could not have been a proximate cause of injury on April 21, 1998. Had many things been done differently, perhaps the Palmers would have seen the picture. The issue on proximate cause is not how events might have played out differently, but how they played out in this case. The owner's manual picture was not involved. The absence of proof that the plaintiffs ever saw the picture makes the manual picture irrelevant.
*605 ¶ 151. The other bases for finding error, the rule of completeness, does not trump all other rules of evidence. The "ultimate filter" through which all evidence must pass is the requirement that any improper prejudice caused by evidence not greatly outweigh its probative value. Jenkins v. State, 507 So.2d 89, 93 (Miss.1987), citing M.R.E. 403. The rule of completeness is just one of many considerations prior to the final filtering. M.R.E. 106. Implicit in most decisions to redact part of a document is that there is unfair prejudice in the complete document. Regardless, since there never was any evidence that supposed defects in the manual were seen by the plaintiffs, admitting an incomplete exhibit is no more reversible error than failure to admit any of it would have been.

2. Failure to permit experts to rely on excluded SCI report
¶ 152. The majority explains the background of the Special Crash Investigation Report. I will not repeat that here. The majority concludes that it was proper to exclude the report from evidence since a disclaimer by the federal agency that had published it indicated that the agency had not adopted it as authoritative or reliable. The report was prepared by a non-governmental crash investigator, whose opinions were neither accepted nor rejected by the agency.
¶ 153. Error is found when the trial court later prohibited two of plaintiffs' experts from giving opinions based on data in the excluded report. The trial judge's stated basis for limiting the testimony was that the report had been excluded from evidence. I agree with the majority that the admissibility of the material on which an expert has relied is not the important focus. What should have been the subject of questions by an attorney or the court was whether the excluded report contained the kind of data that are of the type reasonably relied upon by experts. M.R.E. 703.
¶ 154. Perhaps the report was not of the kind that should be relied upon; the earlier exclusion of it could be seen in part as a conclusion about its trustworthiness, since the agency's disclaimer meant that the government was not adopting it. Still, an exploration of whether the report was the kind that was reasonably relied upon by experts should have been undertaken. Though James Hannah's testimony was excluded, another plaintiff accident reconstruction expert had already testified regarding the matters that it appears Hannah also was to address. Hannah did not perform any of his own investigation into the details of the tragedy that was the basis of this trial, as had the first expert. The proffer made by the plaintiffs was that Hannah would say, based on his analysis of the excluded report, that even had Jennifer been belted she would have been killed, and that the impact speed was only 10-12 miles per hour. Similar testimony had already been introduced through an expert whose opinion was based on an investigation of this specific accident. The evidence, then, was cumulative.
¶ 155. The reports issue was also raised as to the expert Taras Rudnitsky. In a proffer, defense counsel said that the witness would testify in reliance on the reports about the estimated "Delta V" (a term of art explained in the majority opinion), the location of the seating, and where Jennifer was seated prior to the deployment of the air bag. Even without the report, the witness was allowed to testifybased on an assumption from other evidence on possible Delta V figuresthat "unquestionably" the air bag should not have deployed in this accident. Further, absent the air bag, the witness stated that *606 Jennifer likely would have survived this accident. He testified at considerable length about how the air bag could have been made so as not to deploy at such a low speed collision. That is an opinion based on Delta V figures. The witness also gave his expert opinion on the proper orientation between seats and air bags and the flaws in Volkswagen's design. The witness was allowed to present his expert opinions on these issues despite the ruling on the reports.
¶ 156. A proper inquiry into the basis of these experts' opinions might have led to the admission of additional testimony. However, I find that the same evidence was still introduced, either relying on other data or through another witness. I agree with the majority that the error was harmless.

3. National Transportation Safety Board 1995 Recommendations
¶ 157. The majority finds that it was error not to introduce a letter sent in late 1995 by the National Transportation Safety Board that the visor warnings might be insufficient. The letter gave notice of seven serious accidents regarding children, and suggested mailing to purchasers notice not to put small children in the front seats.
¶ 158. The trial judge excluded the letter in part because the agency that sent it was not the one empowered by Congress to promulgate standards for automobile manufacturer warnings. The National Highway Safety Administration has been commanded by Congress to adopt regulations setting automobile safety standards. Cooper v. General Motors Corp., 702 So.2d 428, 432 (Miss.1997); 49 U.S.C.S. § 30103. The different agency which sent the letter was indicating that the standards set by the congressionally authorized agency were flawed. There was no evidence that Volkswagen had failed to give the warnings required by regulation. In addition, there was evidence about similar and later concerns about the need for better warnings. The jury was told that in 1997 additional warnings were mailed to owners, surely meaning that what was already told owners was potentially inadequate. The Palmers denied receiving Volkswagen's 1997 letter, but the issue was made that the warnings already given were not informing consumers of the dangers.
¶ 159. Even more importantly, I agree with the majority that there is not in Mississippi a post-sale duty to warn. Therefore, providing supplemental warnings after the vehicle was purchased was not part of Volkswagen's duty. Notice post-sale is not usually the duty of the manufacturer. There is nonetheless often widespread publicity about problems post-sale, or there may be recall obligations. The majority finds that the agency letter that was excluded here should have been admitted to balance the defendant's evidence that the general public knew of the dangers of children riding in the front seat of cars. Yet I do not find an abuse of trial court discretion when the letter was from November 1995, and the accident did not occur until April 1998. The public's awareness at the later date might not relevantly be addressed by one agency's opinion about public knowledge at the earlier, especially when steps to increase awareness were implemented between those dates.

4. Videos
¶ 160. The majority finds that certain videos prepared by Volkswagen were misleading. The videos were of what was called "sled tests." The videos were introduced during the testimony of Leif Alfreddson, a senior safety test engineer with Volkswagen A.G. in Germany. The majority opinion finds that the jury likely *607 would have taken the videos to be simulations of the subject accident. However, Mr. Alfreddson was asked on direct examination in front of the jury, "Were you trying to exactly simulate what happened in this accident?" Alfreddson replied, "No. I took the speed which Mr. McHenry had calculated for this accident, and I took that velocity change, and then I did theconducted these five sled tests at that speed." The jury was told that the tests were not meant to be simulations of the Palmer crash. If jurors should have been told that more often to dispel any doubts, that could have been accomplished by cross-examination and argument.
¶ 161. This is a quite subjective decision made by the majority on appeal. Were the videos, relevant to explain some of the details of air bags and acknowledged not to be simulations of this accident, still so likely to mislead that their probative value was greatly outweighed by the prejudice? I do not find that to be true, and regardless, I do not find that the trial judge abused his discretion when he computed the relative weights. The videos were relevant, limited in their reach, and were not substantially outweighed by prejudicial impact. I find no error.

5. Excluded testimony (Majority's issue VI)
¶ 162. The majority finds an imbalance in what certain Volkswagen witnesses were allowed to state and limitations on similar experts by the plaintiffs.
¶ 163. The plaintiffs offered Dr. Wogalter, who was accepted as a human factors expert. He has a doctorate in psychology and specializes in warnings. Dr. Wogalter determines whether or not warnings are effective based upon likely human behavior. An example of his testimony was that someone will probably notice a sign in bright red or yellow before he would notice one printed in black and white. He testified that the visor warnings were inadequate because the federally required contrast was not contrasting enough. He admitted on cross-examination that none of the alleged shortcomings were required by regulations. In fact, the specific wording for the visor label is mandated by the regulation. FMVSS 208.
¶ 164. The objections that the majority finds to have been erroneously upheld occurred when Dr. Wogalter was asked about the dangers to children caused by air bags. Volkswagen argued that this was outside his area of expertise. After lengthy voir dire, the court found that he was incompetent as an expert on the dangers of air bags. The court suggested that the question could be rephrased but that as asked, any answer would be improper. Dr. Wogalter was not prohibited from testifying to the adequacy of warnings, merely from testifying as an expert regarding air bags.
¶ 165. It is true that a warnings expert need not have expertise in all areas of dangers. He can express opinions as to whether the warnings adequately convey the dangers. Had the plaintiffs put on the air bag expert to explore the dangers, then asked Dr. Wogalter how warnings of those dangers should effectively be expressed, that would have been admissible. Instead, counsel attempted to get from Dr. Wogalter expert opinions that after voir dire the court found he could not express. Within a trial judge's range of discretion on evidentiary rulings, I find no reversible error.
¶ 166. I also find no corresponding laxity in permitting Volkswagen's warnings expert to testify. Dr. Alan Dorris was the expert. He did not testify in any meaningful fashion at least in response to defense questions about the dangers of air bags. The plaintiffs objected when Dr. Dorris was asked technical questions on direct *608 and most of those objections were sustained. In fact, I find more straying into improper testimony in response to cross-examination. He was never asked for an expert opinion on the dangers of air bags. He was shown the Jetta's owner's manual pages with respect to the air bag system and asked whether the warnings given were adequate and, ultimately, whether they complied with government requirements. These were not the same questions that Dr. Wogalter was prohibited from answering. Finally, Dorris's testimony dealt with the history of the warnings mandated by regulation, the process for creating a regulation, how the agency made changes to proposed regulations in response to comments received, and similar matters.

6. Defense witnesses (Majority's issue VII)
¶ 167. Greg Miller was a former TRW engineer. The majority finds that though he was not designated by Volkswagen as an expert, he was nonetheless over objection allowed to give expert testimony. I agree that some of his testimony was technical, specialized and outside the scope of knowledge of an ordinary person. He therefore should have been designated as an expert, qualified as such, and then allowed to testify.
¶ 168. Though error occurred, I do not find prejudice to the fairness of the trial. Miller offered few expert opinions as his role was to explain the mechanics of air bags. The testimony was largely consistent with other witnesses, and was not challenged as to its accuracy. Whether it helped or hurt either side is not clear to me. The entire case concerned air bags, and Miller explained how they worked. The one assertion in the majority opinion of prejudice is that Miller testified that this air bag did not inflate any more aggressively than the average; a plaintiff's expert said that it did. On that one point some evidence contrary to the plaintiff's expert was introduced that might not have reached jurors had Miller's testimony been rejected. I cannot find error so prejudicial to the plaintiffs as to require a new trial from this.
¶ 169. John Melvin's testimony centered on his work on an advisory committee regarding safety matters. The majority accepts that much of his testimony was valid lay evidence. Where error was found was to permit him without prior designation, offering, and acceptance as an expert to testify about how air bags work. I find that Melvin provided largely neutral evidence on a complicated facet of the case. I do not find that the outcome of the trial was prejudicially affected by his testimony.

7. Seat belt use (Majority's issue VIII)
¶ 170. The most important legal consideration regarding seat belts is that Volkswagen could not be prevented from introducing evidence that air bags and seat belts were designed to operate together, and that warnings were given accordingly. Seat belt use was quite relevant. Generally, admission at trial of relevant evidence cannot be prohibited by an act of the legislature. Whitehurst v. State, 540 So.2d 1319, 1323-24 (Miss.1989) (blood alcohol test was admissible even though statute would bar it).
¶ 171. Moreover, I do not find that the statute, which holds that failure to use seat belts cannot be considered comparative negligence, would bar this evidence. Miss.Code Ann. § 63-2-3 (Rev.1996). I find the majority's interpretation of the controlling principles to be correct.
¶ 172. This case dealt with inadequate warnings and defective design. The seat belt and air bags were designed to be used *609 together. The majority accepts that Jennifer's failure to use her belt that day was relevant. Though the remainder of the family's non-use was not especially relevant, I cannot find reversible error from that. The majority states that evidence of the driver's, Anne Palmer's, failure to use a seat belt at the time of the accident was highly prejudicial, especially when it was not accompanied by an instruction that the non-use could not be considered a proximate cause of the accident. However, this case had nothing to do with how the accident occurred. The issue was whether Volkswagen had a defective air bag system. I cannot believe that failure on the family's part to use their seat belts cast them in a prejudicial light and skewed the jury's deliberations.

8. Cross-examination of Volkswagen experts (Majority's issue XII)
¶ 173. Here again we face the issue of the use of crash investigation reports that the trial judge had ruled were inadmissible. In this iteration, the issue is whether reversible error occurred when some of Volkswagen's experts were not allowed to be cross-examined with data from the reports. The majority concludes that there was such error.
¶ 174. The data that would have been used for cross-examination was that some children properly belted had nonetheless been killed. That issue got before the jury in other ways. Among them was through the evidence that in 1997 a new warning for the vehicle visor had been sent by Volkswagen that it was unsafe for any child under the age of twelve, even properly belted, to be in the front seat. The Palmers denied ever receiving this warning. The importance of the point for this final issue that I address is that the jury was told that a child under twelve was not safe in the front seat, belted or not. Cross-examination of these witnesses would have made the point more strongly, but I do not find reversible error because it was not allowed to occur.

Conclusion
¶ 175. An appellate court's review is necessarily in part subjective. Whether error should cause reversal depends on subjective considerations of the effect of that error on the outcome. Discretion is given trial judges on evidentiary rulings because there are so many that at times must be made. Finality is important in court proceedings. So is accuracy. Constant retrials clearly will not permit the former, and doubts can arise that repetition will improve the latter.
¶ 176. An outstanding jurist, Presiding Judge John F. Onion, Jr. of the Texas (Supreme) Court of Criminal Appeals, noted the perception "that appellate judges watch from on high the legal battle fought below, and when the dust and smoke of the battle clear they come down out of the hills and shoot the wounded." Black v. State, 723 S.W.2d 674, 677 n. 1 (Tex.Crim.App.1986) (Onion, P.J., dissenting). Though there is humor in that phrasing, I do not suggest that this case is anything but heart-rending. Some errors were made below. If the errors likely affected the result, then our duty is to reverse. The majority in exercising its judgment finds the need to do so. I find, though, that within the bounds of the possible, at this trial the battle was fairly fought. This suit concerned whether Jennifer was in the front seat because of a defect in the warnings that were given or that her injuries were worsened because of a defect in the design of the air bag. Each side presented its case with reasonable completeness and without unreasonable prejudice. We should affirm.
*610 McMILLIN, C.J., THOMAS AND GRIFFIS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] The section on air bags entitled "Use of child restraints on the front seat" contained further warnings contradicting the picture and caption. The section stated:

A child seat or infant carrier installed on the front seat may be struck and knocked out of position by the rapidly inflating air bag in a frontal collision. The air bag could greatly reduce the effectiveness of the child restraint and could even injure the child during inflation. For this reason and because children are generally better protectedwhen properly restrained for their age and sizein a rear seating position, we strongly recommend that children always sit in the back seat. See "Child Safety" on Page 23 [the page featuring the picture and caption]. If exceptional circumstances require the use of a child seat on the front seat, the child's safety and well-being require that the following precautions be taken.
WARNING
Never install rearward facing child seats or infant carriers on the front passenger seat. A child can be seriously injured when the passenger air bag inflates and forces the child seat or carrier and the child against the backrest or door. Always install rearward facing child seats or infant carriers on the rear seat.
Forward facing child seats or infant carriers installed on the front passenger seat may interfere with the deployment of the air bag and cause serious injury to the child. Always install forward facing child seats and infant carriers on the rear seat. If you must install a forward facing child restraint on the front passenger's seat in exceptional circumstances, always make sure that the passenger seat is adjusted as far to the rear as possible for the maximum possible distance between the instrument panel and the child. The backrest must remain in an upright position.
Always follow the manufacturer's instructions provided with the child seat or carrier.
[2] The dissent argues that the entire manual should have been excluded because the Palmers admit that they never read it. In fact, the dissent's argument would support exclusion of all the Jetta's air bag warnings in this case because the Palmers admitted they never noticed any of the Jetta's air bag warnings. With respect, the dissent's reasoning ignores the fact that an inadequate warning may proximately cause an injury precisely because the plaintiff failed to notice it; for example, a plaintiff may successfully argue that he was injured by a product because its warning was unnoticeable and, therefore, defective. Here, the Palmers argue that the totality of the Jetta's warnings were inadequate. The Palmers contend that they did not notice the sun visor warnings because they were defective, but would have noticed adequate sun visor warnings. The sun visor warnings directed the reader to the owner's manual. Had the Palmers heeded the sun visor warnings, they would have read the manual and encountered the potentially misleading picture and caption.

The dissent would find that the entire manual was irrelevant and should have been excluded. Then, remarkably, the dissent finds that the Palmers suffered no prejudice from the admission of sections of the "irrelevant" manual that clearly favored Volkswagen without the only sections that favored the Palmers. Admission of the redacted manual allowed Volkswagen to argue that, had the Palmers read the manual, they would have been adequately warned. This argument provided strong support for Volkswagen's defense of its warnings. The Palmers were certainly prejudiced by admission of the redacted manual.
[3] During air bag deployment, the air bag's inflator performs a chemical reaction that causes the fabric bag to fill with gas and inflate. An air bag's inflator can be tested for aggressiveness by conducting a tank test. The inflator is placed inside a closed tank. The inflator is deployed, and a measurement is taken of how much the pressure inside the tank increased. This measurement is called the "tank pressure curve" or "tank test curve." There are two important characteristics of the tank test curve. First is the peak pressure, a measurement of how high the pressure gets. Second is the pressure rise rate, a measurement of how fast the pressure changes from the time deployment begins until the peak pressure is reached. The pressure rise rate is the most significant characteristic of inflator aggressiveness.
[4] An air bag has a sensor that regulates when and how strongly the air bag deploys. The sensor's decision responds to change in the car's velocity. Measurement of velocity change is expressed as Delta V. Every air bag has an all-fire threshold, which is the Delta V at which the sensor will always tell the air bag to deploy. Air bags also have a no-fire threshold, which is the Delta V at which the sensor will never tell the air bag to deploy. A Delta V between the all-fire and no-fire thresholds may cause the air bag to deploy, and is called the may-fire threshold.
[5] Federal preemption was raised in pleadings and in a summary judgment motion. No relief was granted below based on that concept, and the matter is not renewed on appeal.